STATE of Wisconsin, Plaintiff-Respondent,†

v.

James L. SCHUMAN, Defendant-Appellant.

Court of Appeals

*No. 98–2275–CR. Submitted on briefs February 26, 1999.—Decided April 15, 1999.*

(Also reported in 595 N.W.2d 86.)

†Petition to review denied.

398

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Richard L. Kaiser* of *Law Offices of Richard L. Kaiser* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, with *William L. Gansner*, assistant attorney general.

Before Dykman, P.J., Eich and Roggensack, JJ.

EICH, J.    James L. Schuman was convicted, after a jury trial, of attempted first-degree intentional homicide and solicitation to commit first-degree intentional homicide. He was sentenced to thirty-five years in prison. He appeals from the judgment of conviction and from the circuit court's order denying his motion for postconviction relief. The dispositive issue on appeal is whether the trial court erred in refusing Schuman's request for a jury instruction on the defense of entrapment. After careful consideration, we conclude that such an instruction was reasonably required by the evidence, and we therefore reverse the judgment and order and order a new trial.

The charges arose from a police undercover operation in La Crosse in early 1997. The operation began after Herbert Miller—a convicted felon and an acquaintance of Schuman—reported to the La Crosse Police Department that Schuman had approached him on several occasions asking whether he could find someone to kill Schuman's wife, with whom Schuman was involved in a drawn-out, bitter divorce proceeding. As a result of Miller's accusations, a Wisconsin Department of Justice investigator, Eric Szatkowski, posing as a "hit man" (ostensibly located by Miller), telephoned Schuman, and the two men agreed to meet. During their first and subsequent meetings and conversations—all of which were taped by Szatkowski—Schuman said that his wife had ruined his life and put his children in foster homes, and that he wanted her killed. After several discussions of the details of such an endeavor, Schuman agreed to pay Szatkowski $10,000 to kill his wife, and indicated he would pay additional sums for the death of her father if

he was "in the way." Miller also told Szatkowski that he wanted the killing to take place during the weekend of February 28, 1997, when he would be out of town with his two children. In subsequent conversations, Schuman reaffirmed his desire to have his wife killed—and her boyfriend, too, if necessary—and the two men continued to discuss the "details," including Szatkowski's payment. On the morning of February 27, 1997, Schuman was arrested as he was preparing to leave town with his children.

Schuman's defense at trial was that he was never really seeking a "hit man," but only wanted to find someone who would play "dirty tricks" on his wife—such as planting drugs on her or scaring her—in an attempt to shorten the divorce proceedings and get his children out of foster care; and he testified that he agreed to meet with Szatkowski "just to talk and see what kind of prank he was gonna pull." He testified that it wasn't until Szatkowski mentioned a gun that he (Schuman) first realized he was "confront[ing] . . . a killer" and that, at this point, he became frightened, fearing what might happen if he just "walk[ed] away" from the discussions—even though he had every intention of backing out before the plan could be consummated. Schuman stated that throughout their conversations, he interpreted various statements made by Szatkowski as "direct threats" as to what would happen if Schuman backed out and went to the police; and he feared that his precipitous withdrawal would jeopardize his and his children's safety. Thus, according to Schuman, even though his taped conversations with Szatkowski included discussions of methods and opportunities for killing Schuman's wife, those conversations should not be taken at face value, but rather must be understood in the context of Schuman's state

of mind at the time—that he was only pretending to go along with the plan out of fear.

At the close of evidence, Schuman requested that the jury be instructed on the defense of entrapment. The court denied the request, stating that there was no evidence of "objectionable inducements" on Szatkowski's part which would warrant such an instruction.[1] Schuman renewed the request when the jury, during its deliberations, sent a question to the court asking: "What is the legal definition of entrapment?," to which the court replied: "The court has given you the instructions that you are to consider regarding this case." As indicated, the jury found Schuman guilty of attempted first-degree intentional homicide (of his wife) and solicitation to commit first-degree intentional homicide (of his wife's boyfriend).[2]

██

There is no question that the government may use undercover agents to enforce the law, and that "[a]rtifice and stratagem may be employed to catch

---

[1] The quoted phrase was taken from the comment to WIS J I—CRIMINAL 780, which, after discussing cases dealing with the sufficiency of the evidence of police inducement, states as follows:

> If there is no evidence that the police did any more than create an opportunity for the commission of an offense, then the issue of entrapment should not be submitted to the jury. This conclusion is supported by the fact that the cases uniformly hold that there has been no entrapment when the police have offered only an opportunity for the commission of an offense. A good rule would be that, unless there is some evidence of the use of *objectionable inducements*, the issue of entrapment should not be given to the jury (emphasis added).

[2] Schuman was also charged with—and acquitted of—solicitation to commit first-degree intentional homicide of his father-in-law.

those engaged in criminal enterprises." *Jacobson v. United States*, 503 U.S. 540, 548 (1992) (quoted source omitted). However, those agents "may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Id.* And that is the essence of the defense of entrapment: a situation where the "evil intent" and the "criminal design" of the offense originate in the mind of the government agent, and the defendant would not have committed an offense of that character except for the urging of the agent. *State v. Hilleshiem*, 172 Wis. 2d 1, 8, 492 N.W.2d 381, 384 (Ct. App. 1992). Establishing the defense is a two-step process:

> To establish the defense of entrapment, the defendant must show by a preponderance of the evidence that [he or] she was induced to commit the crime. If the defendant meets [that] burden of persuasion, then the burden falls on the state to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime.

*Id.* at 8–9, 492 N.W.2d at 384 (internal citations omitted).

■

A trial court is justified in declining to give a requested instruction in a criminal case—including an instruction on the defense of entrapment—if it is not reasonably required by the evidence. *Id.* at 9, 492 N.W.2d at 384. And when the appeal is from such a denial, we must view the evidence in the most favorable light it will reasonably admit from the standpoint of the accused. *Id.* at 9–10, 492 N.W.2d at 384, *citing Johnson v. State*, 85 Wis. 2d 22, 28, 270 N.W.2d

153, 156 (1978). Only "slight evidence" is required to create a factual issue and put the defense before the jury. *United States v. Kessee*, 992 F.2d 1001, 1003 (9th Cir. 1993); *see also United States v. Joost*, 92 F.3d 7, 12 (1st Cir. 1996) (defendant has the burden of producing "some evidence" of inducement and lack of predisposition sufficient to raise a reasonable doubt as to whether he or she was an "unwary innocent" rather than an "unwary criminal"). The evidence may be "weak, insufficient, inconsistent, or of doubtful credibility," *United States v. Sotelo-Murillo*, 887 F.2d 176, 178 (9th Cir. 1989) (quoted source omitted); but the defendant is entitled to the instruction unless the evidence is rebutted by the prosecution to the extent that "no rational jury could entertain a reasonable doubt as to either element." *United States v. Hoyt*, 879 F.2d 505, 509 (9th Cir. 1989).

Considering the evidence, as we must, in the light most favorable to Schuman, he testified that he never told Miller, Szatkowski, or anyone else, that he wanted his wife killed. He testified that it was Miller who first approached him, after overhearing him talking on the telephone about the divorce. According to Schuman, Miller offered to get one of his friends to play a "dirty trick" on Schuman's wife. Schuman also testified that there was nothing in his conversations with either Miller or Szatkowski prior to his first meeting with Szatkowski to indicate that he was being set up with a "hit man." According to Schuman, it was only when Szatkowski mentioned a firearm that he first believed he was dealing with a professional hit man who intended to do much more to his wife than simply play a "dirty trick" on her. At this point, Schuman said, he became frightened and thought "the safest way out" would be "to see what [Szatkowski] had on his mind

[and] get out of there." He said he only discussed details about killing his wife "just to give [Szatkowski] something to satisfy him at the moment so [Schuman] could get out of there." He said his aim in all this was to convince Szatkowski that he "wasn't gonna run to the police." Schuman explained that his plan was to get some money for Szatkowski's expenses so he could tell him he didn't want things to go any further and then could abort the plan prior to its execution. As indicated, Schuman also testified that he interpreted various statements made by Szatkowski as threats as to what would happen if he went to the police, and that he continued to "play along" because, while he intended to back out at all times, he feared that any sudden withdrawal would place both him and his children in danger.

The question is not whether we, or the trial court, believe, or are willing to give credence to Schuman's testimony. The test for evidentiary support for a requested jury instruction is, as we have indicated, whether "a reasonable construction of the evidence will support the defendant's theory, viewed in the most favorable light it will reasonably admit from the standpoint of the accused." *State v. Coleman*, 206 Wis. 2d 199, 213, 556 N.W.2d 701, 707 (1996). And in making that determination,

> neither the trial court nor the reviewing court may weigh the evidence, but instead may only ask whether a reasonable construction of the evidence, viewed favorably to the defendant, supports the alleged defense. If this question is answered affirmatively, then it is for the jury, not the trial court or [the appellate] court, to determine whether to believe defendant's version of the events.

405

*Id.* at 213–14, 556 N.W.2d at 707 (internal quotations and citations omitted). *See also State v. Jones,* 147 Wis. 2d 806, 816, 434 N.W.2d 380, 383 (1989); *State v. Mendoza,* 80 Wis. 2d 122, 153, 258 N.W.2d 260, 273 (1977).

The United States Court of Appeals for the Ninth Circuit made a similar point in *Kessee, supra.* In that case, the defendant, responding to a police informant's requests to enter into a drug deal, eventually proposed selling drugs to the informant, telling him that he had engaged in more than fifty such deals in the past. Charged with conspiracy and possession of drugs with the intent to distribute, the defendant requested an entrapment instruction based on his testimony that he had never dealt drugs before, but falsely portrayed himself as an experienced dealer in order to impress the informant who, he said, had lured him into the transaction. The trial court denied the request and the Court of Appeals reversed, noting that, although the defendant's credibility had "suffered from cross-examination and impeachment by tapes of his telephone calls which made his story hard to believe," he was nonetheless entitled to the instruction:

> The trial judge's skepticism [as to the defendant's story] was certainly well-founded. At least one juror would have to be very impressed by Kessee's testimony on the stand, so impressed as to accept unlikely stories to explain the way Kessee sounded on the telephone, his inconsistencies, and his statements to the police. Nevertheless, the jury, not the trial judge, had the power to decide whether Kessee's account on the witness stand was the truth. . . . Kessee presented "some evidence" for each of the two elements of entrapment, so "[t]he weight and credibility of the conflicting testimony are issues properly reserved [to] the jury." The jury

could have believed . . . that he was falsely boasting when he described himself as a major drug dealer.

*Id.*, 992 F.2d at 1004 (internal citations omitted).[3]

■

We are in a similar position here. While Schuman's story stretches the imagination, we cannot say that no reasonable juror, having observed him testify at trial, could (a) determine that his participation in the scheme was induced by Szatkowski, or (b) entertain a reasonable doubt that he was predisposed to commit the charged crimes. Because Schuman's testimonial

---

[3] Pointing out that "only slight evidence is needed to create a factual issue and get the defense to the jury," the *Kessee* court stated: "the evidence may be weak, insufficient, inconsistent, or of doubtful credibility, but the defendant is entitled to an instruction unless the prosecution rebuts the evidence such that no rational jury could entertain a reasonable doubt as to either element [of the defense of entrapment]." *Id.*, 992 F.2d at 1003 (internal quotations and citations omitted).

Similarly, in *United States v. Joost*, 92 F.3d 7, 12 (1st Cir. 1996), the defendant was arrested for possession of a firearm following an undercover operation which initially sought to involve him in a counterfeiting enterprise. When, in one of many taped conversations with the agents, one of them broached the subject of firearms, the defendant—who was "no stranger in criminal activities"—said that he could obtain weapons for them to use in a robbery they were discussing. In support of his request for an entrapment instruction, the defendant testified that his true intention in his dealings with the agents was to avoid dealing in firearms, sticking solely to the counterfeiting scheme. As in *Kessee*, the Court of Appeals reversed the trial court's denial of the requested instruction, noting that, while "[i]t may well be that a jury would dismiss all of this as a pack of lies," because the defendant's story was "both detailed and corroborated by [other] evidence . . .," that was "a task for the jury, not the judge." *Id.* at 13.

account of that participation, if true, established an issue of fact, it was for the jury, not the trial judge—and not this court—to assess his credibility or the believability of his story, and to resolve any conflicts in the evidence. Our task under the applicable law, as we have pointed out earlier in this opinion, is not to consider or assess these matters, but simply to determine whether, viewing the evidence in the light most favorable to Schuman, his testimony reasonably supports the giving of the requested instruction. And we conclude that it does.

*By the Court.*—Judgment and order reversed and cause remanded with directions.