¶ 1.
SHIRLEY S. ABRAHAMSON, J.[1]
This is a review of an unpublished per curiam decision of the *577 court of appeals affirming the judgment of conviction by the circuit court for Lafayette County, James R. Beer, Judge.[2] The criminal charges arose out of a confrontation between the defendant and two Wisconsin Department of Natural Resources conservation wardens, Joseph Frost and Nick Webster.
¶ 2. Following a three-day trial, a jury convicted Robert Stietz, the defendant, of resisting a law enforcement officer, Wis. Stat. § 946.41(1) (2013-14),[3] and intentionally pointing a firearm at an officer, § 941.20(lm)(b).[4]
*578 ¶ 3. On appeal, the court of appeals rejected the defendant's argument that his constitutional right to present a defense was denied by the circuit court's refusal to instruct the jury on self-defense. The court of appeals affirmed the judgment of conviction.
¶ 4. The dispositive issue presented is whether the circuit court erred when it refused to instruct the jury on self-defense as the defendant requested.[5] The dispute in the instant case regarding the self-defense instruction centers on whether the defense of self-defense is supported by sufficient evidence. State v. Head, 2002 WI 99, ¶ 113, 255 Wis. 2d 194, 648 N.W.2d 413.
¶ 5. On viewing the record in the light most favorable to the defendant, as we must,[6] we conclude, contrary to the State's position, that there was adequate evidence supporting a self-defense instruction *579 in the instant case and that the circuit court erred in refusing the defendant's request for the instruction.
¶ 6. The evidence was sufficient in the instant case because a reasonable fact-finder could have determined that the defendant reasonably believed that the two men who accosted him with weapons on his land and on land upon which he had an easement were not wardens with the Wisconsin Department of Natural Resources; that the defendant reasonably believed that the two men were trespassers hunting illegally; that because the two men forcibly wrested his rifle from him and then drew their handguns on him, the defendant reasonably believed that the two men were unlawfully interfering with his person; that the two men pointing handguns at the defendant caused him to fear for his life; and that the defendant pointed his handgun at the two men believing he had to defend himself.[7] In sum, the jury could conclude that the defendant threatened to use force as he reasonably believed necessary to prevent or terminate the interference with his person.
¶ 7. Because we conclude that there was sufficient evidence to support the privilege of self-defense, we conclude that the circuit court erred in failing to instruct the jury on self-defense as requested by the defendant. We further conclude that the circuit court's error affected the defendant's substantial rights; it was not harmless error.
¶ 8. Accordingly, we reverse the decision of the court of appeals and the judgment of conviction. We remand the cause to the circuit court for a new trial.
*580 f 9. We begin with a discussion of the statutory defense of self-defense and the standard of review. We then examine the record. We determine that there was sufficient evidence to support a jury instruction on self-defense and that the circuit court erred in refusing to give the instruction. Lastly, we assess the error and conclude that the circuit court's error in refusing to instruct the jury on self-defense affected the defendant's substantial rights.
H—I
¶ 10. The defendant raised an affirmative defense of self-defense. The privilege of self-defense is set forth in Wis. Stat. § 939.48(1) as follows:
A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself. (Emphasis added.)
¶ 11. The pattern jury instruction for self-defense, Wis JI—Criminal 800,[8] instructs the jury on the elements of self-defense as follows (footnotes omitted):
*581 Self-Defense
Self-defense is an issue in this case. The law of self-defense allows the defendant to threaten or intentionally use force against another only if:
• the defendant believed that there was an actual or imminent unlawful interference with the defendant's person; and,
• the defendant believed that the amount of force the defendant used or threatened to use was necessary to prevent or terminate the interference; and
• the defendant's beliefs were reasonable.
Determining Whether Beliefs Were Reasonable
A belief may be reasonable even though mistaken.[9] In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense. The reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of the defendant's acts and not from the viewpoint of the jury now.
¶ 12. A circuit court has broad discretion in deciding whether to give a requested jury instruction. State v. Coleman, 206 Wis. 2d 199, 212, 556 N.W.2d *582 701 (1996).[10] The circuit court must, however, exercise its discretion in order "to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence." State v. Vick, 104 Wis. 2d 678, 690, 312 N.W.2d 489 (1981) (quoting State v. Dix, 86 Wis. 2d 474, 486, 273 N.W.2d 250 (1979)).
¶ 13. A court must determine whether a reasonable construction of the evidence will support the defendant's theory "viewed in the most favorable light it will 'reasonably admit from the standpoint of the accused.' " Head, 255 Wis. 2d 194, ¶ 113 (quoting State v. Mendoza, 80 Wis. 2d 122, 153, 258 N.W.2d 260 (1977) (quoting Ross v. State, 61 Wis. 2d 160, 172, 211 N.W.2d 827 (1973))).
¶ 14. Whether there are sufficient facts to warrant the circuit court's instructing the jury on self-defense is a question of law that this court decides independently of the circuit court and court of appeals, but benefiting from their analyses. Head, 255 Wis. 2d 194, ¶ 44 (citing State v. Mayhall, 195 Wis. 2d 53, 57, 535 N.W.2d 473 (1995)); State v. Sartin, 200 Wis. 2d 47, 53, 546 N.W.2d 449 (1996); State v. Chew, 2014 WI App 116, ¶ 7, 358 Wis. 2d 368, 856 N.W.2d 541.
*583 ¶ 15. A jury must be instructed on self-defense when a reasonable jury could find that a prudent person in the position of the defendant under the circumstances existing at the time of the incident could believe that he was exercising the privilege of self-defense. A circuit court may deny a requested self-defense instruction when no reasonable basis exists for the defendant's belief that another person was unlawfully interfering with his person and that the defendant used or threatened the use of such force as he reasonably believed necessary to prevent or terminate the interference. Head, 255 Wis. 2d 194, ¶¶ 112-113.
¶ 16. Wisconsin law establishes a "low bar" that the accused must surmount to be entitled to a jury instruction on the privilege of self-defense. State v. Schmidt, 2012 WI App 113, ¶ 12, 344 Wis. 2d 336, 824 N.W.2d 839. The accused need produce only "some evidence" in support of the privilege of self-defense. Head, 255 Wis. 2d 194, ¶ 112; State v. Peters, 2002 WI App 243, ¶¶ 21-23, 27-29, nn.4-5, 258 Wis. 2d 148, 653 N.W.2d 300.[11]
¶ 17. Evidence satisfies the "some evidence" quantum of evidence even if it is "weak, insufficient, inconsistent, or of doubtful credibility" or "slight."[12]
*584 ¶ 18. Crucial to applying the "some evidence" standard is that a court is not to weigh the evidence. State v. Mendoza, 80 Wis. 2d 122, 152, 258 N.W.2d 260 (1977). A court does not "look to the totality of the evidence," as that "would require the court to weigh the evidence—accepting one version of facts, rejecting another—and thus invade the province of the jury." Mendoza, 80 Wis. 2d at 153; Ross v. State, 61 Wis. 2d 160, 172-73, 211 N.W.2d 827 (1973) ("This test does not call for a weighing of the evidence by the trial judge.").[13] Rather, "the question of reasonableness of a person's actions and beliefs, when a claim of self-defense is asserted, is a question peculiarly within the province of the jury." Maichle v. Jonovic, 69 Wis. 2d 622, 630, 230 N.W.2d 789 (1975) (citing Higgins v. Minagham, 76 Wis. 298, 45 N.W. 127 (1890)).[14]
¶ 19. In the instant case, if "some evidence" were offered at trial that the defendant reasonably believed that another person was unlawfully interfering with his person and that he used or threatened to use such force as he reasonably believed necessary to prevent or terminate the interference, "then it is for the jury, not *585 for the [circuit] court or this court, to determine whether to believe [the accused's] version of events." Mendoza, 80 Wis. 2d at 153.
¶ 20. With the low "some evidence" quantum of evidence standard in mind, we turn to the record to determine whether there was sufficient evidence to support an instruction to the jury on self-defense.
¶ 21. The State argues that the defendant's testimony was incredible on its face and that, as a matter of law, the evidence was insufficient to warrant a self-defense instruction, and that any claim of self-defense was so discredited that no reasonable jury would believe the defendant.[15]
f 22. We focus on the encounter from the defendant's perspective. We view the record favorably to the defendant, as the case law requires, to assess whether a reasonable jury could find that a person in the position of the defendant under the circumstances existing at the time of the incident could reasonably believe that he was exercising the privilege of self-defense.
¶ 23. We do not present the defendant's one-sided picture of the events as representing the entire story. The defendant's testimony was not always consistent and it was contradicted. We conclude, however, that the defendant's version of the events, sometimes supported on specific points by the two wardens, provided an adequate factual basis supporting the defendant's explanation that he was exercising his right to defend himself. The jury was not obliged to believe the *586 defendant, but they could have believed him. Following is the evidence from the defendant's perspective.
II
f 24. The defendant was a 64-year-old farmer at the time of the incident in question. He owned a parcel of land in Lafayette County on which he pastured cattle, hunted, and gathered morel mushrooms. The land consists of grassy, open areas, including pasture areas; rolling hills; and some wooded areas.
f 25. The defendant's parcel of land is surrounded by land owned by the defendant's uncle. The defendant had the benefit of an easement (right-of-way) for ingress and egress over the uncle's land to Highway 81.
f 26. A fence separates the defendant's land from his uncle's land on all sides, interrupted only by a metal, swinging "cattle gate." The gate marks the point where the easement, recognizable as a two-track, dirt-road-like path, connects the defendant's land to Highway 81. The fence keeps trespassers out and cattle in.
f 27. The uncle testified that he and the defendant generally stayed off of each other's land. Occasionally, the defendant and his uncle would enter each other's land to check the fence line.
¶ 28. The defendant testified that, over the years, he has had problems with trespassers. Many would hunt illegally, and some would vandalize his property. He posted "no trespassing" signs and asked the Lafayette County Sheriff for help with trespassers on numerous occasions. During deer season—when he often had the worst trespassing problems—the defendant would check his land for trespassers. He would be *587 armed when he went on the land, because he knew that anyone hunting illegally would likely be armed.
f 29. On the afternoon in question, Sunday, November 25, 2012, the last day of gun deer season, the defendant patrolled his property for trespassers and walked his fence line to make sure that it had no holes. Now that gun deer season was over, he planned to pasture a longhorn cow. Because the defendant was not going to hunt and would not have to haul a deer carcass home, he drove his wife's Chevrolet sedan. He parked the sedan in a field near the gate to his land.
¶ 30. The defendant carried his rifle in a safe position[16] with the safety on and kept a handgun in his coat pocket as he always did. Although the handgun held six rounds, he kept only five rounds in it because the gun did not have a safety; he did not like to leave a round in the cylinder that could be accidentally discharged.
¶ 31. The defendant wore a camouflage coat and hat. He did not wear any blaze orange (as most hunters would) because he was not hunting and was on his own private property.[17]
f 32. Wisconsin Department of Natural Resources (DNR) Wardens Frost and Webster were out on patrol on the afternoon in question. They were looking for hunters who were trying to nab an eleventh-hour *588 deer after the gun deer season ended at 4:45 p.m. (20 minutes after the 4:25 p.m. sunset).
f 33. They drove on the surface roads, using binoculars to find hunters. They saw no one and heard no signs of hunting. At around 4:58 p.m., the two wardens noticed a car (the defendant's wife's Chevrolet sedan) parked in a field along a fence line about a quarter-mile from the highway. The two wardens drove their DNR pickup truck across the field and up to the sedan. As one of them peered into the sedan, he observed what he concluded were signs of hunting: an empty gun case, a bottle of "Buck Lure" (a scent-killer spray), and a camouflaged tree seat. The other warden checked the vehicle's registration and found that the sedan was registered to Robert Stietz, the defendant, and his wife, Susan Stietz.
¶ 34. Apparently concluding that whoever owned this sedan was hunting after the gun deer season ended, the two wardens decided to look around. Before leaving their DNR pickup truck, both wardens donned their blaze-orange, department-issued jackets. Like their uniforms, their blaze-orange jackets bore DNR insignia. The DNR patch insignia on the shoulder of each arm of the jacket were not, however, as conspicuous as the DNR insignia on their uniforms. Each warden also had a DNR badge on his jacket and a hat bearing a DNR insignia patch. Although neither warden had a rifle, as most deer hunters do, each carried a handgun and a long flashlight.
¶ 35. The two wardens headed north and came upon a partially open cattle gate. They walked through the open cattle gate, entered the defendant's fenced-in parcel, and followed a path in the grass worn down by cattle's hooves.
*589 ¶ 36. The defendant testified that as he was walking on his uncle's land checking the fence line, he saw blaze orange in the woods. He headed toward the cattle gate to enter his land and identify these blaze-orange-clad figures. He testified: "I encountered two people in orange that was on my property. . . and I didn't know who they were." He stated: "I wondered who was trespassing. This is my thought, I was wondering who was trespassing in my land that I did not know."
¶ 37. The two wardens testified that they heard the defendant before they saw him. As they were walking on the cattle path, they heard a stick snap behind them, turned around, and saw the defendant walk a few steps, stop and look around, and then continue walking.
f 38. It was "nearly completely dark," according to Warden Webster, when the three men crossed paths. As the two wardens approached the defendant from a distance of about 20 or 30 yards, flashlights were shined at the defendant.
¶ 39. The defendant explained that he did not see the DNR insignia or badges on the men's attire as the men approached. The defendant testified that he did not notice the DNR insignia on their jacket sleeves because he was "wondering who was trespassing in [sic] my land" and "trying to study their facets]." The blaze-orange jackets signified hunters to the defendant and the darkness reduced the chance that the defendant would identify the two men as wardens by their uniforms.
¶ 40. According to the defendant, neither man clearly identified himself as a game warden as they approached him, leading the defendant to suspect that the two were trespassers hunting illegally on his land. *590 The men did nothing to correct the defendant's misunderstanding of their identity. Although he testified that he heard one of the men mumble something about "warden," and the other mumbled something about "Green County," the defendant said he thought the men were asking if he was or had seen a warden.
f 41. The defendant's belief that the two men were trespassing hunters was bolstered by the defendant's interpretation of their words and conduct. The two men inquired into how many deer the defendant had seen that day and whether he was hunting. The defendant told the men he had seen seven doe but that he was not hunting.
¶ 42. The defendant testified that when he told the two men that he was looking for trespassers and was not hunting, one of the men "threw up his arms" and appeared "riled" by this statement. The defendant testified that this response was prompted because "I believe they took it for that they was [sic] trespassing and that will be my feeling."
¶ 43. The defendant also testified that the two men appeared to be circling him early on in the encounter as he attempted to back away from them by ducking back through the gate and heading towards his car to drive home.
¶ 44. One of them, Warden Webster, asked the defendant whether his rifle was loaded. The defendant said yes. The other man, Warden Frost, twice asked for the rifle. The defendant said no both times. The two men began to make the defendant fear for his life. According to the defendant, "That is when they proceeded—I felt like I was being attacked right at that time."
*591 ¶ 45. Warden Frost initiated physical contact with the defendant, grabbing the defendant by the front of his garment while reaching for the riñe.
¶ 46. The other man, Warden Webster, entered the fray. The men grappled over the rifle, pointing the barrel every which way. The rifle was wrested from the defendant. Warden Frost ended up on his back on the ground. He held the rifle momentarily, considering whether to use it. He cast it aside when he could not figure out how to turn the safety off. This tussle ended when the defendant no longer had the rifle.
¶ 47. The defendant then saw Warden Webster fumbling to pull a handgun from a holster on his hip. At trial, all three men agreed that Warden Webster was the first to pull his handgun and that he pointed it at the defendant. Warden Frost then drew his handgun and pointed it at the defendant. The defendant reached for his own handgun because, as he testified, he thought "my God, he's going to shoot." The three men agreed that Warden Frost and the defendant drew their handguns about "simultaneously." The defendant stated to the two men that he had a right to protect himself. There they were, three men with handguns trained on each other.
¶ 48. The defendant testified he did not know the two men were wardens at this point; he just knew he was scared and feared for his life:
I felt like I was being attacked right at that time.
[[Image here]]
[A]ll of a sudden I seen the pistol coming up. And I figured, my God, he's going to shoot.
[[Image here]]
I was scared, darn scared.
*592 [[Image here]]
At that very instant I had the pistol in my right pocket and I drew my pistol at the very—simultaneously. I said, I have the right to protect myself which I am doing at this time.
[[Image here]]
[SJomeone else pulled their pistol out and I was fearful for my life so I drew mine so I would not get shot.
¶ 49. The two wardens and the defendant testified that the defendant told the men that he was exercising his right to defend himself: "I have the right to protect myself which I am doing at this time." And the defendant told the two men, repeatedly, that he would lower his handgun when they lowered theirs because one of them, Warden Webster, drew first.
¶ 50. While pointing his gun at the defendant with one hand, Warden Webster used his other hand to activate his collar microphone and call Lafayette County dispatch for assistance. The defendant testified that even when he heard this call being made, he still "really didn't know positive for sure [that they were officers] . . . because I never seen no credentials."
f 51. The defendant testified he was relieved when the call for help was made. He began to realize, for the first time, that the two men were wardens and that assistance in the form of sheriffs deputies would soon arrive. The defendant then backed a few feet away from the two men, moving nearer to the gate. He assumed this position and waited for the backup to arrive.
¶ 52. The defendant continued to point his handgun at the men after they called for backup. He stated he did so only because the two refused to lower their handguns first.
*593 f 53. The defendant refused to lower his handgun because he felt unsafe, even after realizing that the two men were wardens. It was dark out, and the three of them were in an unpopulated rural area. The two men, who had earlier attacked him without provocation, held their handguns pointed at the defendant's face. The defendant, by contrast, held his gun in one hand near his side and was leaning against a fence post.
¶ 54. The defendant saw a squad car's emergency lights flashing. After the first deputy sheriffs arrived, the two wardens backed away from the defendant with their handguns still drawn. They retreated to the squad car along with the deputy sheriff.
f 55. A lengthy standoff ensued. As more deputies arrived, they spoke to the defendant to persuade him to disarm. The defendant explained that after the deputies assured him that he would not be "gang tackled," he lowered his gun to his side, emptied the cartridges onto the ground, and dropped the gun to the ground.
¶ 56. The defendant peaceably surrendered. He walked to the squad car where he was arrested.
¶ 57. No one was hurt. No weapons were ever fired by anyone. All three men acknowledged that the defendant never threatened to shoot the two men; he never raised his voice during the encounter; he never used any profanity; he did not try to prevent the two men from calling for help and backup; and he did not try to prevent or discourage the retreat of the two men to the squad car.
¶ 58. Insofar as the instruction on self-defense hinged on the defendant's credibility, credibility is a question to be resolved by the jury, not the circuit court, the court of appeals, or this court. State v. *594 Coleman, 206 Wis. 2d 198, 213-14, 556 N.W.2d 701 (1996). A court does not weigh the testimony. The court focuses, instead, on whether there is "some evidence" supporting the defendant's self-defense theory.
¶ 59. The evidence that the defendant was in fear for his life and believed he was exercising the threat of reasonable force went beyond the minimal quantum of "some evidence" necessary to establish the defendant's right to a jury instruction on self-defense.
¶ 60. We conclude that an adequate basis exists in the record to support a self-defense instruction and to allow the defense of self-defense to be argued to and considered by the jury. A reasonable jury could find that a person in the position of the defendant under the circumstances existing at the time of the incident could reasonably believe that the two men were unlawfully interfering with his person and that he was threatening reasonable force in the exercise of his privilege of self-defense. Therefore, we conclude that the circuit court erred in refusing to instruct the jury on self-defense.
III
I 61. Because we conclude that the circuit court erroneously refused to instruct the jury on self-defense, we next consider whether the error affected the defendant's "substantial rights."[18] Wis. Stat. § 805.18(2).[19] This statute codifies Wisconsin's harmless error rule.[20]
*595 f 62. The harmless error inquiry raises a question of law that this court decides. State v. Magett, 2014 WI 67, ¶ 29, 355 Wis. 2d 617, 850 N.W.2d 42.
¶ 63. A defendant's substantial rights remain unaffected (that is, the error is harmless) if it is clear beyond a reasonable doubt that a rational jury would have come to the same conclusion absent the error or if it is clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.[21]
¶ 64. The jury's acquittal of the defendant on four of the six charges (including the most serious felony count) in part depended on the defendant's testimony that at times conflicted with that of the wardens. The acquittals suggest that the jury believed all or some of the defendant's testimony and, if given *596 the self-defense instruction, might have acquitted the defendant on one or both of the two charges upon which they convicted the defendant.
f 65. We therefore conclude that the circuit court's error in refusing to give the jury a self-defense instruction was not harmless error. It is clear beyond a reasonable doubt that a rational jury would not have come to the same conclusion absent the error; it is clear beyond a reasonable doubt that the error complained of contributed to the guilty verdict.
¶ 66. Because self-defense could have absolved the defendant of one or both of his convictions, the circuit court's refusal to give the self-defense instruction affected the defendant's substantial rights. The error was not harmless.
* * * *
¶ 67. In sum, after viewing the record in the light most favorable to the defendant, as we must, we conclude that there was sufficient evidence supporting a self-defense instruction in the instant case. Accordingly, we conclude that the circuit court erred in refusing to instruct the jury on self-defense.
¶ 68. A reasonable fact-finder could determine that the defendant reasonably believed that the two men who accosted him with weapons on his land and on land upon which he had an easement were not wardens with the Wisconsin Department of Natural Resources; that the defendant reasonably thought that the two men were trespassers hunting illegally; that because the two men forcibly wrested his rifle from him and then drew their handguns on him, the defendant reasonably believed that the two men were unlawfully interfering with his person; that the two men *597 pointing handguns at the defendant caused him to fear for his life; and that the defendant pointed his handgun at the two men believing he had to defend himself. In sum, the jury could conclude that the defendant threatened to used force as he reasonably believed necessary to prevent or terminate the interference with his person.
¶ 69. We further conclude that the circuit court's error affected the defendant's substantial rights; it was not harmless error.
¶ 70. Accordingly, we reverse the decision of the court of appeals and the judgment of the circuit court. We remand the cause to the circuit court for a new trial.
By the Court.—The decision of the court of appeals is reversed and the cause remanded.
f 71. ANN WALSH BRADLEY, J., did not participate.

 Four justices—Justice Rebecca Bradley, Chief Justice Patience D. Roggensack and Justice Daniel Kelly (both of whom join Justice Rebecca Bradley's concurrence), and I—join this opinion holding that the decision of the court of appeals is reversed and that the circuit court erred in failing to instruct the jury regarding self-defense. Justice Daniel Kelly joins this opinion to the extent that it is not inconsistent with Justice Rebecca Bradley's concurrence.
With regard to the trespass issue, Justice Rebecca G. Bradley's concurrence is joined by Chief Justice Patience D. Roggensack except for Section II and is joined by Justice Daniel Kelly in full. The concurrence would on remand "require the circuit court to instruct the jury.on trespass" but does *577 "not decide whether the language in Stietz's proposed trespass instruction was appropriate." This aspect of Justice Rebecca G. Bradley's concurrence has not garnered a majority of the justices participating in the instant case.
Justice Annette K. Ziegler is joined by Justice Michael J. Gableman in dissent.
Justice Ann Walsh Bradley did not participate.

 State v. Stietz, No. 2014AP2701-CR, unpublished slip op. (Wis. Ct. App. Apr. 14, 2016).

 All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

 The jury found the defendant guilty of two of the following six offenses charged: (1) first-degree recklessly endangering safety (Wis. Stat. § 941.30(1)); (2) resisting or obstructing an officer (Warden Frost), use of a dangerous weapon (Wis. Stat. §§ 946.41, 939.63(1)); (3) resisting or obstructing an officer (Warden Webster), use of a dangerous weapon (Wis. Stat. §§ 946.41, 939.63(1)); (4) negligent handling of a weapon (Wis. Stat. § 941.20(1); (5) intentionally pointing a firearm at a law-enforcement officer (Warden Frost) (Wis. Stat. § 941.20(lm)(b); (6) intentionally pointing a firearm at a law-enforcement officer (Warden Webster) (Wis. Stat. § 941.20(lm)(b)).
The defendant filed a postconviction motion that was denied.
The defendant's sentence included one year of initial confinement and three years of extended supervision on the *578 felony and a consecutive two-year probation term on the misdemeanor. The defendant had served the confinement portion of his sentence by the time his brief was filed in this court, but he remained subject to extended supervision, probation, and loss of civil rights.

 We need not and do not address the following issues that the parties addressed:
Did the law enforcement officers violate the defendant's Second Amendment rights when they forcibly disarmed the defendant of his loaded rifle?
Did the defendant have the right to argue and instruct the jury that the law enforcement officers who encountered the defendant on his uncle's property were trespassers?
Did the court of appeals contradict State v. Hobson, 218 Wis. 2d 350, 577 N.W.2d 825 (1998), by foreclosing a self-defense claim against the wardens, whom the defendant did not know were officers and who were not claiming to arrest the defendant but were trying to disarm him?

 State v. Head, 2002 WI 99, ¶¶ 9, 113, 255 Wis. 2d 194, 648 N.W.2d 413.

 Intentionally pointing a firearm toward or at another threatens use of force. State v. Watkins, 2002 WI 101, ¶ 56, 255 Wis. 2d 265, 647 N.W.2d 244.

 The defendant also requested Wis JI—Criminal 810, relating to whether the defendant had to retreat, and also proposed adaptations of these pattern instructions. We need not consider those formulations because we conclude that the record supports the defendant's request for this pattern jury instruction.

 See Maichle v. Jonovic, 69 Wis. 2d 622, 628, 230 N.W.2d 789 (1975) ("The reasonableness of the actor's beliefs, moreover, is not defeated by a subsequent determination that his beliefs were mistaken.").

 "[A] criminal defendant is entitled to a jury instruction on a theory of defense if: (1) the defense relates to a legal theory of a defense, as opposed to an interpretation of evidence; (2) the request is timely made; (3) the defense is not adequately covered by other instructions; and (4) the defense is supported by sufficient evidence." State v. Coleman, 206 Wis. 2d 199, 212-13, 556 N.W.2d 701 (1996) (internal citations omitted); Johnson v. State, 85 Wis. 2d 22, 28-29, 270 N.W.2d 153 (1978).

 The evidence may be facts presented by the defense or the State or through cross-examination. Coleman, 206 Wis. 2d at 214.

 State v. Schuman, 226 Wis. 2d 398, 404, 595 N.W.2d 86 (Ct. App. 1999) (citing United States v. Sotelo-Murillo, 887 F.2d 176, 178 (9th Cir. 1989); United States v. Kessee, 992 F.2d 1001, 1003 (9th Cir. 1993)).

 State v. Peters, 2002 WI App 243, ¶ 27 n.4, 258 Wis. 2d 148, 653 N.W.2d 300 ("The 'some' evidence standard is a relatively low threshold, in part because of the distinct functions of judge and jury."); Walter Dickey, David Schultz & James Fullin, Jr., The Importance of Clarity in the Law of Homicide: The Wisconsin Revision, 1989 Wis. L. Rev. 1323, 1347 (The "some" evidence standard is a relatively low threshold, in part, because of the distinct functions of judge and jury—evaluating the weight and credibility of the evidence is traditionally a task reserved to the jury.).

 See also State v. Jones, 147 Wis. 2d 806, 816, 434 N.W.2d 380 (1989) (citing State v. Mendoza, 80 Wis. 2d 123, 156, 258 N.W.2d 260 (1977)).

 "If perfect self-defense is placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that one of the defendant's beliefs was not reasonable." Head, 255 Wis. 2d 194, ¶ 70.

 The defendant described this safe position as holding the rifle in front of his body, with one hand on the foregrip of the rifle, and the other somewhere around the stock. Neither of his hands was on the trigger. The muzzle was pointed up.

 The defendant did have a blaze orange vest stuffed into a coat pocket, which, he testified, remained in his pocket from weeks before. This vest was the "sliver" of blaze orange that the wardens testified they saw on the defendant.

 Peters, 258 Wis. 2d 148, ¶ 29.

 The harmless error rule set forth for civil actions applies to criminal proceedings via Wis. Stat. § 972.11. State v. Harvey, 2002 WI 93, ¶ 39, 254 Wis. 2d 442, 647 N.W.2d 189.
*595 Wisconsin Stat. § 805.18(2) provides:
No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial. (Emphasis added.)

 State v. Sherman, 2008 WI App 57, ¶ 8, 310 Wis. 2d 248, 750 N.W.2d 500 (citing Harvey, 254 Wis. 2d 442, ¶ 39 (footnote omitted)).

 State v. Magett, 2014 WI 67, ¶ 29, 355 Wis. 2d 617, 850 N.W.2d 42; Nader v. United States, 527 U.S. 1, 15, 18 (1999); Chapman v. California, 386 U.S. 18, 24 (1967); Harvey, 254 Wis. 2d 442, ¶ 46 (citing Nader, 527 U.S. at 18).