COURT OF APPEALS
DECISION
DATED AND FILED

December 28, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2020AP416-CR**
**2020AP417-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2016CF272
2016CF3398

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

MARQUES EDWARD HUBBARD,

      DEFENDANT-APPELLANT.

APPEALS from judgments and an order of the circuit court for Milwaukee County: CYNTHIA MAE DAVIS and DAVID A. FEISS, Judges. *Affirmed*.

Before Brash, C.J., Donald, P.J., and White, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Marques Edward Hubbard appeals judgments of conviction entered upon guilty pleas for two counts of second-degree recklessly endangering safety and one count of felony witness intimidation. He also appeals the circuit court's order denying his postconviction motion for plea withdrawal after an evidentiary hearing. Hubbard argues that the circuit court improperly relied upon inadmissible evidence when it denied him postconviction relief. We conclude that any errors in the admission of evidence at the evidentiary hearing were harmless because they did not affect the outcome of his postconviction motion. Therefore, we affirm.

## BACKGROUND

¶2 This case arises out of a double shooting that occurred in January 2016. According to the criminal complaint, following a physical altercation between Hubbard and his live-in girlfriend, A.F., which included A.F. threatening Hubbard with a knife, Hubbard then shot multiple times into the house as he was leaving. A.F. and her thirteen-year-old son were both shot and suffered injuries. Hubbard was charged with six counts including first-degree recklessly endangering safety and weapon possession.[1]

¶3 In August 2016, Hubbard was charged in a separate case with felony intimidation of a witness by a person charged with a felony with domestic abuse assessments. That criminal complaint alleged that Hubbard had made six phone

---

[1] Hubbard was charged with (1) first-degree recklessly endangering safety using a dangerous weapon with a domestic abuse assessment; (2) first-degree recklessly endangering safety using a dangerous weapon; (3) possession of a firearm by a felon; (4) resisting an officer; (5) misdemeanor bail jumping; (6) endangering safety by use of a dangerous weapon by discharging a weapon into a building. All counts except the last included the habitual criminality repeater penalty enhancer.

calls from jail knowingly and maliciously attempting to dissuade A.F. from giving testimony at trial or any criminal proceeding against him.

¶4 Hubbard resolved all charges against him with a plea at a hearing on September 9, 2016.[2] In the first case, Hubbard pled guilty to two counts of second-degree recklessly endangering safety with penalty enhancers for habitual criminality repeater and the use a dangerous weapon on both counts and a domestic abuse assessment on the first count. The State agreed to dismiss the remaining counts in the first case, but those counts would be read-in at sentencing. In the second case, Hubbard pled guilty to felony intimidation of a witness by a person charged with a felony with a domestic abuse assessment. In December 2016, Hubbard was sentenced to consecutive sentences totaling twenty-six years, bifurcated as eighteen years of initial confinement and eight years of extended supervision.

¶5 In May 2019, Hubbard filed a WIS. STAT. § 809.30 (2019-20)[3] postconviction motion requesting a *Machner*[4] hearing and withdrawal of his guilty pleas. The circuit court[5] held a *Machner* hearing on November 26, 2019.

---

[2] The Honorable Cynthia Mae Davis presided over Hubbard's plea hearing and sentencing. We refer to Judge Davis as the trial court.

[3] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[4] *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

[5] The Honorable David A. Feiss presided over Hubbard's postconviction evidentiary hearing and issued the order denying his postconviction motion. We refer to Judge Feiss as the circuit court.

*Trial counsel's testimony*

¶6     The first witness at the **Machner** hearing was trial counsel, who testified that he recalled Hubbard telling him that he had a physical altercation with A.F., she grabbed and threw a glass at him, and he left the house. Trial counsel testified that he discussed self-defense with Hubbard in the context of A.F. threatening him with the broken glass and discussed the "concept of proportionality" with him as well as the "concept of retreat." Trial counsel testified that Hubbard never said "that someone fired a gun or weapon at him."

¶7     Trial counsel further testified that Hubbard "was consistent in wanting to have a jury trial[.]" Trial counsel explained that Hubbard believed A.F. and her son might not appear at trial, that they discussed defense strategies—trial counsel hired an investigator and a DNA analyst and they discussed self-defense, the retreat and proportionality issues, as well as reviewed the relevant jury instructions. He explained that at "one point in time Mr. Hubbard indicated that there was someone else who shot at the house or potentially shot in the direction of the house" but clarified that Hubbard had never told counsel that anyone was shooting at him.

¶8     During the State's cross-examination of trial counsel, he testified that, upon refreshing his memory with a police report, all of the bullet casings found at the scene came from a .40 caliber firearm, the same caliber of gun that was recovered by the police from Hubbard's flight path. Additionally, he testified that a neighbor identified Hubbard in a police photo array and the neighbor stated that he saw Hubbard walking on the side of A.F.'s house with a firearm.

4

*Hubbard's testimony*

¶9      The second witness at the ***Machner*** hearing was Hubbard, who testified about his meetings with trial counsel.  In pretrial proceedings, he told trial counsel "about the shots being fired" at him and that he "return[ed] fire."  He recounted the day of the shooting as follows:  Hubbard had a "minor argument" with A.F. that involved a phone call and coffee spilled on Hubbard followed by A.F. throwing the cup on the floor.  Hubbard and A.F.'s disagreement turned physical, with each of them striking the other and A.F. biting Hubbard.  Hubbard contended that A.F. grabbed and threw knives at him, then she broke a bottle and tried to stab him with it.  He then tried to leave and ended up wrestling the broken bottle away from A.F. and choking her.  As he left the house, A.F.'s brother appeared next to A.F. with a "small caliber handgun" and A.F. tried to stop her brother's hand from rising up to shoot Hubbard.  He then stated:

> Two shots go off at the ground.  When the two shots go off at the ground, I pull my weapon, I turn, and I fire.  The door slams.  I look.  My gun is jammed.  The bullet is hanging out the side of my gun.  I pull the slide off my gun to release the bullet, and I go towards the back of the house.  I still got the gun in my hand because I don't know if he's going to come out the back door and that has to be the door that he was let in to because he wasn't in the house prior to this.  Once I get down the alley, I get maybe two blocks away from the house, I see the police, like a block up at a stop sign, I felt it was safe enough to get rid of the gun so I got rid of it.

¶10     Hubbard testified that he told trial counsel about shooting at A.F.'s house because he felt threatened and A.F.'s brother was shooting at him.  He said that trial counsel did not discuss self-defense with him, but only said counsel would have someone look into his allegations.  Trial counsel's private investigator spoke with him, but neither the investigator nor trial counsel ever got back to him about any evidence found at the house.  He stated that he did not "know about the

self-defense instruction in the jury trial at all"; instead, he only knew about self-defense in the context of "justifiable homicide." Hubbard testified that trial counsel did not discuss "retreat" with him; further, he contended that he was retreating when he was shot at. Trial counsel did discuss "proportionality" with him, but only in the context of the "knife situation" with A.F. He stated he would have gone to trial and not pled to the charges if he had known about self-defense.

¶11 Hubbard testified that trial counsel only discussed the possibility of whether A.F. and her son would appear at trial. After the State moved to admit A.F.'s and A.F.'s son's statements to the police under the forfeiture by wrongdoing doctrine, trial counsel told him that "regardless of what [Hubbard] was saying, if this woman and her son got on the stand and said that [Hubbard] shot [them] there was no way he could convince a jury—he didn't see a way he could convince a jury otherwise[.]" Trial counsel informed him that after the State filed the motion to admit A.F.'s and her son's statements under the forfeiture by wrongdoing doctrine, "they no longer had to come to court." Trial counsel did not inform him that even with that motion, if A.F. and her son came to court, they would still have to testify.

¶12 Hubbard testified that regardless of whether A.F.'s and her son's statements were admitted under the forfeiture by wrongdoing doctrine or by their testimony at trial, he would have wanted to pursue a trial. He would not have entered a plea because "the truth would have to come out" if he went to trial.

¶13 During cross-examination by the State, Hubbard testified that he told a police officer in an interview that he had not fired a gun into the house, he knew what self-defense was, and he knew he could not carry a firearm because he was a felon. He also told the police that he never heard any gunshots on the day of the

shooting and that he ran when he saw the police arrive. He stated that he had reviewed a transcript of the phone calls underlying the charge for felony intimidation of a witness as well as the accompanying criminal complaint. He acknowledged that he admitted to A.F. that he fired upon the house but told her, within the call, that the shooting was not intentional. He testified that he mentioned A.F.'s brother's role to his attorney. Hubbard admitted he had a firearm on the day of the shooting.

¶14     At this point, the State asked Hubbard if he had made a phone call to A.F. two months earlier, while he was incarcerated in prison. When he denied it, the State moved to admit a recording of a phone call. Hubbard objected that the phone call was not relevant, but the State argued it was relevant for impeachment purposes because Hubbard denied making the call and it went "to his overall character." The court then addressed the objection:

> It would go to credib[ilit]y, which is really the crux of what I have to decide. I mean, I've gotten completely divergent testimony from [trial counsel] and from Mr. Hubbard. Ultimately, I have to make a finding as to which of them is credible in terms of what they've talked about in their conversations. So if, in fact, I guess if he had admitted that he made the call, it wouldn't seem particularly relevant, but if he's denied it and there's proof that he made the call, wouldn't that go to his credibility?

The State contended that it would play the call and Hubbard could confirm or deny it was his voice. It was not seeking confirmation or the foundation of the evidence of the call, but only seeking to impeach Hubbard on his denial. The court then overruled Hubbard's objection to admitting the recording of the phone call. The State then played the phone call and asked Hubbard if that was his voice on the recording. Hubbard denied it was his voice. Hubbard again objected, but the

court allowed the State to ask Hubbard additional questions about the contents of the phone call.

> [THE PROSECUTOR:] So, Mr. Hubbard, in that call, the female voice, [A.F.], you can disagree with me, but the female voice says, "you're not supposed to be calling," and the male voice says, "yeah, I know, but I wanted to talk to you." Do you agree with me that's what was on that call?
>
> [HUBBARD:] Yes. That's what I just heard.
>
> [THE PROSECUTOR:] And you agree with me that as part of your sentence in this case, you were told to have no contact with [A.F.]?
>
> [HUBBARD:] Exactly.
>
> [THE PROSECUTOR:] But you are saying that that is not you on that call calling her on September 30th?
>
> [HUBBARD:] No.
>
> [POSTCONVICTION COUNSEL:] Objection. Asked and answered.
>
> THE COURT: The answer can stand. Let's move on.

¶15    The court asked if there was additional evidence to resolve the case and trial counsel volunteered that his private investigator had met with Hubbard in 2016 and had prepared a report on that interaction, a report that trial counsel stated "impact[ed] some of Mr. Hubbard's testimony" at the hearing. Hubbard did not think the report was "needed."

*Post-**Machner** proceedings and decision*

¶16    After the hearing, the State moved to reopen evidence and supplement the record. Relevant to this inquiry, the State requested that trial counsel's investigator's report be admitted. Hubbard opposed reopening evidence

to admit the investigator's report, arguing it was cumulative under WIS. STAT. § 904.03 and the report consisted of hearsay.

¶17 At a February 2020 hearing, the circuit court denied Hubbard's postconviction motion. The circuit court explained that it reviewed trial counsel's investigator's report. The circuit court stated that the report was "relevant because Mr. Hubbard and [trial counsel] gave completely diametrically opposed accounts as to what information was contained in their conversations" and "what had or hadn't been discussed between Mr. Hubbard and his counsel." The circuit court explained that while the report was "hearsay, it a hundred percent supports what [trial counsel] testified to and completely undercuts what Mr. Hubbard testified to, as well—but what Mr. Hubbard testified to was undercut also by his statements to two police officers, where he denied having a gun."

¶18 The court concluded that the "relevance" of the recorded 2019 prison call was "minimal." It stated that it would not strike the phone call, but it was not a "driving factor in the [c]ourt's determination." The court stated that from its perspective, the court had the opportunity to observe trial counsel and Hubbard and that's "where the [c]ourt's able to primarily make its determinations with regard to credibility."

¶19 The court found that trial counsel's testimony was "more consistent" with what Hubbard "told the police in terms of denying that he had a firearm." "[B]ased upon primarily the [c]ourt's review of Mr. Hubbard's testimony and [trial counsel's] testimony, the [c]ourt found [trial counsel] much more credible than Mr. Hubbard." The circuit court then "found Mr. Hubbard's testimony to be self-serving and contrived." The court also found that trial counsel "did advise Mr. Hubbard of the right to present a self-defense issue, but that Mr. Hubbard

never told [trial counsel] that there were shots fired from that residence and that Mr. Hubbard's shots were fired in response to those shots." The court concluded that trial counsel was not ineffective in his representation of Hubbard because trial counsel "did discuss self-defense in the context of the facts that were given to him by Mr. Hubbard." The court found that Hubbard suffered no prejudice as a result of trial counsel's representation. On the issue of forfeiture by wrongdoing, the court found that it is "purely speculative" as to what the trial court would have done if Hubbard had not entered a plea. Ultimately, the court concluded that Hubbard failed to demonstrate trial counsel was ineffective, and denied his motion for plea withdrawal as postconviction relief.

¶20     Hubbard appeals.

## DISCUSSION

¶21     We begin with the posture of this case on appeal.[6] Hubbard moved for plea withdrawal as postconviction relief. "A defendant is entitled to withdraw a guilty plea after sentencing only upon a showing of 'manifest injustice' by clear and convincing evidence." *State v. Bentley*, 201 Wis. 2d 303, 311, 548 N.W.2d 50 (1996) (citation omitted). Hubbard argued, in his postconviction motion, that trial counsel failed to explain the affirmative defense of self defense and improperly advised him on forfeiture by wrongdoing. "[T]he 'manifest injustice' test is met if the defendant was denied the effective assistance of counsel." *Id.* To demonstrate ineffective assistance of counsel, a defendant must satisfy the familiar

---

[6] Although Hubbard's cases were resolved before the State's motion to join the cases was decided by the trial court, Hubbard's appeals are consolidated and we address them in the singular for ease of reading.

two-prong test in *Strickland v. Washington*, 466 U.S. 668 (1984). A "defendant must show that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.* at 687.

¶22 "To establish that counsel's performance was deficient, the defendant must show that it fell below 'an objective standard of reasonableness.'" *State v. Breitzman*, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (quoting *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305). Whether trial counsel performed deficiently is a question of law we review independently. *Breitzman*, 378 Wis. 2d 431, ¶38. To establish that "counsel's deficient performance is constitutionally prejudicial, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Thiel*, 264 Wis.2d 571, ¶20 (quoting *Strickland* 466 U.S. at 694). Whether trial counsel's deficient performance was prejudicial is also a question of law we independently. *Breitzman*, 378 Wis. 2d 431, ¶39. If a defendant fails to satisfy one prong of the analysis, the court need not address the other. *See Strickland*, 466 U.S. at 697.

¶23 The circuit court conducted a *Machner* hearing on Hubbard's claim that trial counsel's performance was ineffective and ultimately concluded that trial counsel was not ineffective because trial counsel's account of what conversations transpired before the plea was more credible than Hubbard's account and that there was no evidence that trial counsel's performance prejudiced his defense. On appeal, Hubbard argues that the circuit court erred when it decided the postconviction motion because it erroneously admitted and relied upon the 2019 prison phone call and the investigator's report. Hubbard requests another

11

*Machner* hearing before another court to determine his motion without the consideration of this evidence.

¶24 "The admission of evidence is subject to the circuit court's discretion." *State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448. Hubbard argues that the 2019 phone call was not relevant to the issues raised in the *Machner* hearing over what trial counsel and Hubbard discussed prior to his plea in September 2016. *See* WIS. STAT. § 904.02 ("Evidence which is not relevant is not admissible."). Although Hubbard acknowledges that impeachment of a witness's credibility on cross-examination is relevant, he asserts that the State was not attacking "matters which go directly to his reputation for truth and veracity." *See Barren v. State*, 55 Wis. 2d 460, 464, 198 N.W.2d 345 (1972). Turning to the investigator's report, Hubbard contends that the report was inadmissible hearsay, pursuant to WIS. STAT. § 908.01(3).

¶25 For our inquiry, we will assume without deciding that both the 2019 phone call and the investigator's report were erroneously admitted,[7] and accordingly, we focus on whether this error was harmless—in other words, whether it is clear beyond a reasonable doubt that the error did not affect the outcome of Hubbard's postconviction motion. *See State v. Mayo*, 2007 WI 78, ¶47, 301 Wis. 2d 642, 734 N.W.2d 115. An evidentiary error requires reversal only when this court determines that it is clear beyond a reasonable doubt that error complained of did not contribute to the final result. *State v. Stietz*, 2017 WI 58, ¶63, 375 Wis. 2d 572, 895 N.W.2d 796. We must consider whether the error

---

[7] We note that "[e]videntiary hearings on ineffective assistance of counsel claims are governed by the standard rules of evidence." *State ex rel. Flores v. State*, 183 Wis. 2d 587, 612, 516 N.W.2d 362 (1994).

12

affected Hubbard's "substantial rights[.]" WIS. STAT. § 805.18. "The harmless error inquiry raises a question of law that this court decides." *Stietz*, 375 Wis. 2d 572, ¶62.

¶26 We review the evidence in question to determine whether it influenced the circuit court's decision. First, with regard to the 2019 phone call,[8] the circuit court concluded, from its "perspective, its relevance is minimal." The court expressly stated that this evidence was not "the driving factor in the [c]ourt's determination." Turning next to the investigator's report, the circuit court noted that the report "supported" the same facts as set forth in trial counsel's testimony and "undercut" Hubbard's testimony. We agree that this report is generally cumulative to the evidence offered in trial counsel's testimony. However, the circuit court found trial counsel's testimony was more credible than Hubbard's, and we accept those credibility decisions unless they are clearly erroneous. *See State v. Jenkins*, 2007 WI 96, ¶33, 303 Wis. 2d 157, 736 N.W.2d 24. Therefore, any prejudicial effect from the cumulative evidence is minimal.

---

[8] We agree with the State's assessment that the call was a collateral matter to the *Machner* hearing. The call was played at the hearing to impeach Hubbard's testimony that he did not make the call—the contents of call itself had no bearing on the facts at issue. "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness… may not be proved by extrinsic evidence." WIS. STAT. § 906.08(2). "This statute forbids use of extrinsic evidence to impeach a witness'[s] credibility on a collateral matter." *State v. Rognrud*, 156 Wis. 2d 783, 787, 457 N.W.2d 573 (Ct. App. 1990). "A matter is collateral if the fact as to which error is predicated could not be shown in evidence for any purpose independently of the contradiction." *Id.* Although the State was allowed by law to impeach Hubbard on cross-examination with a question of whether he made the call, the call itself was a collateral matter. After Hubbard denied making the call, the State could not present extrinsic evidence to establish that he made the call. The State had to accept his "no" answer, even if the State believed it was not truthful. Nevertheless, we conclude that it is clear beyond a reasonable doubt that the court would not have reached a different decision on the postconviction motion had it not listened to the 2019 phone call. Therefore, this error is harmless.

¶27 Hubbard argues that the admission of this evidence was consequential and cannot be a harmless error simply because the court considered this evidence. This argument fails. In accordance with its function as a fact-finder in the *Machner* hearing, the court made credibility determinations after hearing testimony and observing the "witness's demeanor and all its facets[.]" *See State v. McCallum*, 208 Wis. 2d 463, 480, 561 N.W.2d 707 (1997). The record reflects that the circuit court's decision rested on a thorough review and consideration of the testimony from both trial counsel and Hubbard. The court noted that trial counsel's testimony was "much more consistent with what Mr. Hubbard had told the police in terms of denying that he had a firearm" in police interviews after the shooting. Further, it found Hubbard's testimony "self-serving and contrived." The record reflects that there was a sufficient basis in the testimony to support the court's finding that trial counsel's account was more credible about the relevant conversations about what Hubbard told counsel about firing the gun in self-defense, the possibility of an affirmative defense, and the application of the forfeiture by wrongdoing doctrine. The court found that the phone call was of "minimal" relevance; and that while the court reviewed the investigator's report and found it supported trial counsel's testimony, there is nothing to support that the report swayed the court's decision. Therefore, any impact of the 2019 phone call and the investigator's report was minimal.

## CONCLUSION

¶28 We conclude that any error in the admission of evidence at the *Machner* hearing was harmless because it did not affect the outcome of his postconviction motion. We further conclude that there is nothing in the record to suggest that the admission of the 2019 phone call and the investigator's report affected the circuit court's credibility determinations or conclusions that trial

counsel's performance was not deficient or prejudicial. *See Mayo*, 301 Wis. 2d 642, ¶47. Therefore, there was no error in the circuit court's determination that trial counsel's representation was not ineffective. *See Breitzman*, 378 Wis. 2d 431, ¶37. Accordingly, Hubbard did not establish a manifest injustice if he was not allowed to withdraw his pleas, *see Bentley*, 201 Wis. 2d at 311, and Hubbard's postconviction motion was properly denied.

*By the Court.*—Judgments and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.