PER CURIAM.
¶1 Terry Lynn Pundsack appeals the judgment of conviction, entered on a jury verdict, finding him guilty of substantial battery, with intent to cause bodily harm.
¶2 On appeal, Pundsack argues that the trial court erred when it declined to instruct the jury on self-defense. He also argues that a standard jury instruction regarding the issue does not accurately reflect the related state statute, WIS. STAT. § 939.48(2)(a) (2017-18).[1] We conclude that Pundsack forfeited his claim that the jury instruction does not accurately reflect § 939.48(2)(a). We further conclude that the trial court properly declined Pundsack's request for the self-defense jury instruction. We, therefore, affirm.
BACKGROUND
The incident
¶3 At approximately 1:58 p.m. on May 27, 2017, Wauwatosa police officers responded to a 911 report of a subject armed with a knife at a house on 62nd Street. When they arrived, the officers ordered Pundsack and a woman, later identified as Bonnie,[2] outside the house. Upon entering the house, the officers saw the victim, Thomas, who appeared to be unconscious, lying on the floor. Based on the incident, the State charged Pundsack with substantial battery with intent to cause great bodily harm.
¶4 Both Pundsack and Thomas had relationships with Bonnie. Thomas had been married to Bonnie. Despite a divorce, Bonnie lived in Thomas's house on May 27, 2017, paid rent to him, and continued to live there at least through Pundsack's trial. Pundsack had known Bonnie for approximately seven years and had a romantic relationship with her.
The trial
¶5 In August 2017, the case proceeded to a three day trial during which Thomas, Bonnie, Pundsack, and three Wauwatosa police officers testified.
Thomas's testimony
¶6 Thomas testified that on the afternoon of May 27, 2017, he was sitting in a recliner in the living room, the back door was open, but the outer screen door was locked.[3] He became aware of Pundsack's presence when he heard him knocking at the back door area and yelling for Bonnie. Thomas told Pundsack to leave his property and then Thomas told Bonnie not to open the door and to lock the other door.
¶7 Moving quickly, Pundsack entered the house through the back door. Thomas glimpsed Pundsack grabbing a box cutter in the kitchen. According to Thomas, Pundsack came "charging at [Thomas]" as Thomas was seated in the recliner, calling Thomas a motherfucker; saying that he was going to kick Thomas's ass, that he was going to kill Thomas, and that Thomas could not tell him that he could not enter his house; and forcefully poking his finger in Thomas's chest. Pundsack was not holding the box cutter then and Thomas did not know whether or not Pundsack had it with him.
¶8 After Pundsack stopped poking him, Thomas got up and told Pundsack to leave the house. Thomas walked toward the dining room. He saw a "look" in Pundsack's eye, he grabbed a steak knife for protection because Pundsack is "a lot bigger" than him, and again told Pundsack to get out. Pundsack then knocked the knife out of Thomas's hand and punched Thomas twice in the face. Thomas then grabbed Pundsack's T-shirt and tried to push him away. Next Pundsack grabbed Thomas from behind, lifted him up, and tried to snap his back. Pundsack then threw Thomas on the hardwood floor which knocked him out. Pundsack smelled of alcohol during the incident.
The officers' testimony
¶9 Officer Thomas Orlowski and Officer Ryan Cepican responded to the scene. Orlowski stated that Thomas was unconscious and was lying on the dining room floor with his head toward the living room and his feet toward the kitchen. Orlowski observed that Pundsack was highly intoxicated, extremely agitated, and belligerent. Pundsack told Orlowski that he had knocked Thomas out. Pundsack also said that then he drank some vodka from the kitchen, called 911, rubbed Thomas's back, and then went into the kitchen again, where he drank more vodka and waited for the police.
¶10 Officer Bronner arrived at the scene after Pundsack was in custody. Bronner testified that Pundsack was aggressive, intoxicated, agitated, used profane language, yelled, and constantly referred to Thomas as a "little twerp." Pundsack also resisted officers when they were putting him in a squad car. Eventually, Bronner transported Pundsack to a hospital. Because of the level of Pundsack's aggression, he was handcuffed. Pundsack told Bronner that he had punched Thomas twice, that he had knocked Thomas out, and that he thought he had killed Thomas. He also said something about Thomas coming at him.
¶11 Orlowski then went to the hospital to relieve Bronner. At Pundsack's request, Orlowski handcuffed both of Pundsack's arms to the hospital bed so that he would not try to get up and assault anyone. Pundsack told Orlowski multiple times that he wished he had hit Thomas harder so that he would have killed him. Pundsack also told Orlowski that he should tell Thomas to leave the state, because when he got out of jail he was going to kill him. Eventually Pundsack passed out. After Pundsack regained consciousness, Pundsack acknowledged that he had been told several times not to be on Thomas's property.
¶12 Pundsack was wearing a T-shirt with torn seams from the neck to the shoulders. Pundsack said that the seams ripped when Thomas grabbed him by the T-shirt and tried to push him toward the door to get him out of the house. Pundsack also said he resisted leaving.
¶13 Cepican interviewed Bonnie on May 27, 2017. Bonnie said that she was in the living room with Thomas when they heard Pundsack banging on the back door. She walked into the kitchen and Pundsack entered the house, grabbed something off the kitchen table, and walked past her into the living room where Thomas was sitting. There was an argument, and Bonnie and Thomas yelled at Pundsack to leave the house. She heard Pundsack threatening Thomas and she saw Thomas pick up a steak knife from the dining room table and again tell Pundsack to leave the house. Thomas raised the steak knife up in front of Pundsack and said, "Get the fuck out of my house." Pundsack then punched Thomas twice in the side of the head and Thomas fell unconscious to the floor.
¶14 Cepican was also present at the hospital when Pundsack was being examined. When Cepican asked Pundsack how much he had to drink that day, Pundsack initially responded "not enough." Pundsack then said that he drank an eighteen pack of beer, a four pack of beer, a couple of shots, and a couple more beers.
Bonnie's testimony
¶15 At trial, Bonnie testified that she was in the kitchen when Pundsack appeared at the back door of Thomas's house. Thomas, who was sitting in a recliner in the living room, yelled that she should close the door, lock it, and that he did not want Pundsack in the house. Pundsack was "probably fairly intoxicated."
¶16 Bonnie did not get to the back door fast enough to close it, and Pundsack entered the door, came into the kitchen, and said that he just wanted to talk to Thomas. Pundsack also told Thomas that he just wanted to talk to him. According to Bonnie, Thomas immediately jumped up from the recliner, grabbed a knife from the corner of the table, and pretended to call 911 to report an intruder in the house with a knife. Thomas also told Pundsack to get out of his house and Pundsack refused to leave. She testified that Thomas held the steak knife very close to Pundsack's face. She heard Pundsack say something like "drop the knife." She saw Pundsack hit Thomas twice. She did not see Pundsack grab Thomas in a bear hug or a body slam. Bonnie further testified that nothing would have stopped Pundsack from walking out of the house.
¶17 Bonnie testified that she remembered talking to an officer, but that she "never" told the officer that she saw Pundsack grab something from the kitchen table and walk with it into the dining room.
Pundsack's testimony
¶18 Pundsack testified that between 9:00 a.m. and 2:00 p.m. on May 27, 2017, he had about six beers and was sober when he arrived at Thomas's house. According to Pundsack, he opened the screen door, knocked on the glass back door which was locked, and Bonnie unlocked the deadbolt. Thomas yelled three times "shut the fucking door," got up from the recliner, and came to the kitchen door. Pundsack admitted that he entered the house without permission and that Thomas "just hates [him]."
¶19 Thomas then returned to the recliner, picked up the phone, and said, "Terry Pundsack, Terry's got a knife, send two squads." Pundsack said, "Dude, why do you gotta be a dick head and do that? You know I don't have a knife." Pundsack turned around, asked Bonnie a question, and petted Thomas's dog saying, "I'll see you later." According to Pundsack, as he was "walking out," Thomas was standing in the dining room and he grabbed Pundsack by the T-shirt. Pundsack told Thomas that he was leaving and that he did not want Thomas to get hurt. Thomas was "a littler guy, he's drunk," and he was "trying to push [Pundsack] out [of the house]." Pundsack looked up and Thomas had a knife in his other hand high over Thomas's head with the blade pointing down. Pundsack grabbed Thomas's wrist and told him to "drop the knife." Thomas was grinding his teeth and pushing, so Pundsack struck Thomas twice-he did not even have time to make a fist. Pundsack then "set [Thomas] down on the floor real gently."
The jury instruction conference
¶20 Prior to the instruction conference, Pundsack filed proposed jury instructions that included WIS JI-CRIMINAL 805 "PRIVILEGE: SELF-DEFENSE: FORCE INTENDED OR LIKELY TO CAUSE DEATH OR GREAT BODILY HARM- § 939.48" and WIS JI-CRIMINAL 810 "PRIVILEGE: SELF-DEFENSE: RETREAT." During the jury instruction conference, trial counsel requested that the trial court instruct the jury on self-defense. The State opposed the request and referenced WIS JI-CRIMINAL 815 "PRIVILEGE: SELF-DEFENSE: NOT AVAILABLE TO ONE WHO PROVOKES AN ATTACK: REGAINING THE PRIVILEGE- § 939.48(2)."[4]
¶21 The State argued that Pundsack had no right to the self-defense instruction because it was undisputed by the three witnesses who were present when Pundsack arrived at Thomas's house (Thomas, Bonnie, and Pundsack), that Pundsack entered the house without an invitation. Trial counsel countered that "an unlawful person doesn't lose the right to self-defense when they have that imminency of danger or death" and that [Thomas] was "presenting the deadly force in front of ... Pundsack's face." The State responded asserting that, pursuant to WIS JI-CRIMINAL 815, under such circumstances Pundsack had to exhaust every other reasonable means to escape before he could use force likely to cause death or great bodily harm. 57:182-3 The trial court denied the request for the self-defense instruction because "there was no indication that ... Pundsack was invited in" and "he had not exhausted his means of escape" as required under the jury instruction.
¶22 The following morning, trial counsel provided additional argument in favor of the self-defense jury instruction. The State then argued that Pundsack's ability to escape or retreat, "it really starts in the moment [Pundsack] enters into the [house]." The trial court agreed with the State and reaffirmed its decision denying the self-defense instruction.
The jury verdict, sentencing, and appeal
¶23 The jury found Pundsack guilty of substantial battery with intent to cause bodily harm. At sentencing, the trial court imposed one year and six months of initial confinement followed by two years of extended supervision. This appeal followed.
DISCUSSION
¶24 On appeal, Pundsack argues that the trial court erred when it declined to instruct the jury on self-defense. He also argues that WIS JI-CRIMINAL 815 does not accurately reflect the related criminal statute, WIS. STAT. § 939.48(2)(a). The State argues that Pundsack forfeited his argument that WIS JI-CRIMINAL 815 does not accurately reflect § 939.48(2)(a). The State also argues that the trial court correctly refused to provide the self-defense instruction.
I. Standard of review and substantive law
¶25 "A [trial] court has broad discretion in deciding whether to give a requested jury instruction." State v. Stietz , 2017 WI 58, ¶12, 375 Wis. 2d 572, 895 N.W.2d 796. Whether there are sufficient facts to warrant the trial court's instructing the jury on self-defense is a question of law that we decide independently of the trial court but benefiting from its analysis. Id. , ¶14.
¶26 A court "must determine whether a reasonable construction of the evidence will support the defendant's theory 'viewed in the most favorable light it will reasonably admit from the standpoint of the accused.' " State v. Head , 2002 WI 99, ¶113, 255 Wis. 2d 194, 648 N.W.2d 413 (citations and one set of quotation marks omitted). Wisconsin law establishes a "low bar" for an accused who seeks a jury instruction on the privilege of self-defense. See State v. Schmidt , 2012 WI App 113, ¶12, 344 Wis. 2d 336, 824 N.W.2d 839. The accused need produce only "some evidence" in support of the privilege of self-defense. Head , 255 Wis. 2d 194, ¶112. "Evidence satisfies the 'some evidence' quantum of evidence even if it is 'weak, insufficient, inconsistent, or of doubtful credibility' or 'slight.' " Stietz , 375 Wis. 2d 572, ¶17 (citations omitted). "We focus on the encounter from the defendant's perspective." See id. , ¶22. "We view the record favorably to the defendant ... to assess whether a reasonable jury could find that a person in the position of the defendant under the circumstances existing at the time of the incident could reasonably believe that he was exercising the privilege of self-defense." See id.
II. The trial court properly declined Pundsack's request that the jury be instructed on self-defense
A. Pundsack forfeited any argument that the trial court used the wrong legal standard
¶27 Pundsack argues that when denying Pundsack's request that the jury be instructed on self-defense, the trial court focused on whether Pundsack exhausted every other reasonable means to escape. The trial court was relying on WIS JI-CRIMINAL 815, which provides in part that "the person may not use or threaten force intended or likely to cause death or great bodily harm unless he reasonably believes he has exhausted every other reasonable means to escape from or otherwise avoid death or great bodily harm." Pundsack argues that, pursuant to WIS. STAT. § 939.48(2)(a),[5] the element of exhausting every other means to escape only applies if Pundsack used force intended or likely to cause death to Thomas. He further argues that WIS JI-CRIMINAL 815, does not accurately reflect § 939.48(2)(a) because the jury instruction includes the phrase "force intended or likely to cause death or great bodily harm ," where as § 939.48(2)(a) only includes the phrase "force intended or likely to cause death. " Pundsack asserts that because he did not use force intended or likely to cause death, he did not have to exhaust every other reasonable means to escape. However, the problem with Pundsack's argument is that he did not make that argument to the trial court during the jury instruction conference.
¶28 The State argues that Pundsack forfeited that argument because he did not raise it before the trial court. The State further argues that if we address the argument, we should reject it for various reasons.
¶29 "The general rule is that issues not presented to the [trial] court will not be considered for the first time on appeal." See State v Caban , 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997) (citation omitted). "By limiting the scope of appellate review to those issues that were first raised before the [trial] court, this court gives deference to the factual expertise of the trier of fact, encourages litigation of all issues at one time, simplifies the appellate task, and discourages a flood of appeals." Id. 604-05. Further, in State v. Hayes , 2004 WI 80, ¶21, 273 Wis. 2d 1, 681 N.W.2d 203, the court explained:
Failure to raise an issue in the [trial] court deprives both the adversary and the [trial] court of the opportunity to address the issue and perhaps remedy the defect without the necessity of an appeal. The waiver rule encourages attorneys to prepare for and conduct trials more diligently and prevents attorneys from sandbagging adversary counsel and the [trial] court.
(citation omitted). In addition, "the rule prevents attorneys from 'sandbagging' errors, or failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal." See State v. Huebner , 2000 WI 59, ¶12, 235 Wis. 2d 486, 611 N.W.2d 727.
¶30 In his reply brief, Pundsack does not address the State's contention that he did not raise the issue below, other than to state that "[f]or purposes of analyzing the case on appeal, the court of appeals should take what the law actually is." Thus, we conclude that Pundsack is deemed to have conceded that he forfeited the argument by failing to raise it before the trial court. See United Co-op. v. Frontier FS Co-op. , 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that the failure to refute a proposition asserted in a response brief may be taken as a concession).
B. The trial court properly concluded that Pundsack had not exhausted every other reasonable means to escape
¶31 As noted above, Pundsack forfeited his argument that he was privileged to use force likely to cause great bodily harm to Thomas without first exhausting every other reasonable means to escape. Previously, Pundsack did not point out the conflict between the statute and the jury instruction, and he never argued to the trial court that he did not need to exhaust every other reasonable means to escape before being entitled to a self-defense jury instruction. Rather, he argued that he reasonably tried to escape under the circumstances. Therefore, we review the trial court's denial of Pundsack's request for the self-defense instruction based upon the jury instruction that Pundsack requested and that the trial court relied on in reaching its decision. Pursuant to that jury instruction, WIS JI-CRIMINAL 815, Pundsack had to exhaust every other reasonable means to escape before using force likely to cause great bodily harm to Thomas. The trial court found that Pundsack did not exhaust every other reasonable means to escape and denied the request for that jury instruction.
¶32 In determining whether a self-defense instruction is supported by the evidence, we determine whether a reasonable construction of the evidence viewed favorably to Pundsack supports the defense. See Head , 255 Wis. 2d 194, ¶113. We agree with the trial court that the evidence does not establish that a reasonable jury could find that a person in Pundsack's position under the circumstances existing at the time of the incident could reasonably believe that he was exercising the privilege of self-defense. See Stietz , 375 Wis. 2d 572, ¶22. The record establishes that even before Pundsack barged into Thomas's house, he knew that Thomas did not want him there. Pundsack heard Thomas yelling at Bonnie to shut the back door. Pundsack also knew that Thomas "hated" him and that he had previously been told not to be on Thomas's property. Indeed, in his appellate brief, Pundsack states that his "not getting out of Thomas's home is conduct likely to provoke an attack." As the trial court found, Pundsack had no "reason to be there other than he wanted to be there."
¶33 The trial court found that Pundsack did not exhaust his reasonable means to escape. It stated that "had [Pundsack] taken steps away-regardless of whether he's attached by the shirt, as you walk away, the shirt rips. So had he retreated and had he explored his reasonable means of escape, as per the jury instructions, he had not exhausted those means of escape. He was not leaving," and "[t]here [are] also indications that [Pundsack] did not exhaust every part of his retreat. He did not leave." The trial court further stated, "I'm not going to allow the self-defense on this basis, that he had not exhausted his means of escape." We conclude that the record supports the trial court's findings that Pundsack did not exhaust his reasonable means to escape.
¶34 The record reflects that Pundsack heard Thomas when Thomas pretended to make a 911 call in an attempt to trick Pundsack into leaving. During that pretend call Thomas requested that two squads come to his house because Pundsack was there with a knife. However, Pundsack did not leave. Moreover, according to Pundsack's own testimony, Thomas grabbed him by the front of his T-shirt and was attempting to push him out of the house. Pundsack testified that he told Thomas "you know what happened ... [the] last time you did this. You know, I mean, yeah, he's a littler guy, he's drunk, and he's trying to push me out." Additionally, Pundsack told Orlowski that Thomas had grabbed his T-shirt and tried to push him toward the back door to get him out of the house. However, Pundsack did not leave.
¶35 Pundsack argues that when he saw Thomas had a knife in his hand he focused on the knife and tried to disarm or otherwise incapacitate Thomas. However, there is no evidence in the record indicating that, from the moment he walked in until the incident ended, there was anything preventing Pundsack from leaving Thomas's house. In fact, Pundsack told Orlowski that he resisted leaving. Moreover, it is undisputed that Thomas was the smaller of the two men. Pundsack described Thomas as the "littler guy." He testified that he takes out Thomas's recycling because Thomas cannot lift the recycling. He also goes to Sam's Club with Thomas to buy dog food because the bag weighs thirty-eight pounds and Thomas cannot carry it.
¶36 Further, during the jury instruction conference, trial counsel argued that when Thomas came at Pundsack with the knife Pundsack was holding onto Thomas and "[h]e doesn't know if at that moment that knife is going to slip and hit him." He did not argue that Pundsack could not have reasonably escaped at that time.
¶37 As noted, Pundsack forfeited his argument that he was privileged to use force likely to cause great bodily harm to Thomas without first having to exhaust every other reasonable means to escape. Therefore, we agree with the trial court that, despite viewing the facts favorably to Pundsack, the record establishes that Pundsack could not reasonably believe that he had exhausted every other reasonable means to escape from or otherwise avoid death or great bodily harm. Therefore, Pundsack's request for the self-defense instruction was properly denied.[6]
CONCLUSION
¶38 For the stated reasons, we affirm the judgment.
By the Court. -Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

In this opinion, we use pseudonyms for the victim and his ex-wife. See Wis. Stat. Rule 809.86(4).

The incident occurred in Thomas's house, which has a back door entrance that opens into the kitchen. The kitchen opens into the dining room which opens into the living room.

Wisconsin JI-Criminal 815 provides in relevant part as follows:
You should also consider whether the defendant provoked the attack. A person who engages in unlawful conduct of a type likely to provoke others to attack, and who does provoke an attack, is not allowed to use or threaten force in self-defense against that attack.
[USE ANY OF THE FOLLOWING PARAGRAPHS THAT ARE SUPPORTED BY THE EVIDENCE.]
[However, if the attack which follows causes the person reasonably to believe that he is in imminent danger of death or great bodily harm, he may lawfully act in self-defense. But the person may not use or threaten force intended or likely to cause death or great bodily harm unless he reasonably believes he has exhausted every other reasonable means to escape from or otherwise avoid death or great bodily harm.]
[A person who provokes an attack may regain the right to use or threaten force if the person in good faith withdraws from the fight and gives adequate notice of the withdrawal to his assailant.]
(Footnotes omitted.)

Wisconsin Stat. § 939.48(2)(a) provides as follows:
Provocation affects the privilege of self-defense as follows:
(a) A person who engages in unlawful conduct of a type likely to provoke others to attack him or her and thereby does provoke an attack is not entitled to claim the privilege of self-defense against such attack, except when the attack which ensues is of a type causing the person engaging in the unlawful conduct to reasonably believe that he or she is in imminent danger of death or great bodily harm. In such a case, the person engaging in the unlawful conduct is privileged to act in self-defense, but the person is not privileged to resort to the use of force intended or likely to cause death to the person's assailant unless the person reasonably believes he or she has exhausted every other reasonable means to escape from or otherwise avoid death or great bodily harm at the hands of his or her assailant.

The State argues that during the instruction conference Pundsack conceded that he had not exhausted every means of escape. We disagree, but need not address the issue because it is not necessary to the resolution of the issues presented in this case.