**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 19, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2260-CR**

Cir. Ct. No. **2020CF82**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

THOMAS JAMES GUOLEE,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Grant County: CRAIG R. DAY, Judge. *Affirmed*.

Before Kloppenburg, P.J., Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   A jury found Thomas Guolee guilty of attempted first-degree intentional homicide. On appeal, Guolee argues that the circuit court

erred in denying his request to instruct the jury on self-defense. We reject this argument because there were insufficient facts to support a self-defense instruction. Accordingly, we affirm.

## BACKGROUND

¶2 The State charged Guolee with one count of attempted first-degree intentional homicide following an incident at the Wisconsin Secure Program Facility (WSPF), where Guolee was incarcerated. At trial, the jury heard testimony from two officers from the Grant County Sheriff's office, three WSPF correctional officers, Guolee, and another WSPF inmate. The jury also saw video footage of the incident (without audio) that was captured on WSPF cameras.

¶3 The evidence at trial showed the following. Guolee and "E.F." were housed in the same unit of WSPF.[1] On Friday, January 17, 2020, Guolee, E.F., and other inmates were returning to their cells. As E.F. was walking past a doorway, Guolee came out of the doorway and physically attacked E.F., knocking E.F. to the ground and repeatedly stabbing E.F. in the neck and head with a "shank," a sharp, knife-like object that Guolee had made a few hours earlier out of a piece of plastic that he had removed from a chair in his cell. When correctional officers broke up the altercation, E.F. was bleeding from his head and his shirt was covered in blood. E.F. was taken to the hospital with several wounds in his neck, head, face, and stomach. None of the officers who responded to the scene observed any injuries on Guolee.

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2023-24), we refer to the victim using initials that do not correspond to his actual name. All references to the Wisconsin Statutes are to the 2023-24 version.

¶4 Guolee testified regarding the events leading up to and during the incident. According to Guolee, E.F. was "crazy," picked fights with other inmates, and was frequently placed in segregation and transferred within the institution as a result. Before the incident, Guolee saw E.F. report a fight to a sergeant, and E.F. was "labeled as a rat" by other inmates. Guolee believed E.F. focused on Guolee after that because Guolee had seen E.F. talking to the sergeant.

¶5 In the months leading up to the incident, E.F. went "out of his way to pick fights with" Guolee. Guolee believed that E.F. was targeting him. The Tuesday before the Friday incident, Guolee was out of his cell for recreation time and E.F. approached Guolee "pulling like he was going to hit" Guolee and threatening to rape Guolee's wife and kill Guolee. Guolee ignored these threats but they got worse throughout the week.

¶6 Guolee testified that on the date of the incident, he was waiting to use the telephone and E.F. showed up and told Guolee that E.F. had a shank. E.F. also kicked over a chair by the telephone and threatened to kill Guolee. Guolee went to other rooms in an attempt to avoid E.F. but E.F. kept following him. Guolee introduced two additional videos (without audio). The first video, taken on January 14, 2020, three days before the attack, shows E.F. walking into a room while Guolee is on the telephone, Guolee hanging up the telephone and standing up to face E.F., E.F. approaching Guolee and pushing a chair into Guolee, and Guolee raising his arm toward E.F. Defense counsel represented, and the circuit court found, that the chair incident in the video was the same event testified to by Guolee. The second video, also taken January 14, shows E.F. following Guolee

into the recreation area and, according to defense counsel, making a gesture toward Guolee.[2]

¶7      Guolee further testified that on the day of the incident, he heard from another inmate that E.F. had said that "if [Guolee] was there at the end of rec, that'd be the last time [he] was there." Regarding the incident itself, Guolee testified that toward the end of recreation, he was about to exit through a doorway and return to his cell when he saw E.F. walking by. Guolee believed that E.F. had seen Guolee behind the partially open door. Guolee testified that E.F. said something to him through the crack in the door. He testified, "I really didn't even listen to what he said. He threatened me again, and that was -- I just was done listening to it." Guolee later elaborated as to E.F.'s statements: "[I]t was the same -- basically the same basic things he'd been saying. Like, he was calling me a honky. Or, like, I don't know, trailer trash. Like, I don't know exactly what he was saying. But it was along those lines." When asked what he thought would happen when he came out the door, Guolee testified that "there was no telling," that WSPF was the "worst prison in Wisconsin," with the "worst" people, and with "institutional violence." He testified that he heard that E.F. had previously been in some "stuff" with other prisoners and "I wasn't going to let him do it to me. And it might not sound right. So, I just went out there first."

¶8      The video of the incident shows the following. Guolee is waiting inside the doorway leading to the outdoor recreation area and looking through a crack while the door is ajar. As E.F. is walking in the outdoor recreation area past

---

[2] We are unable to discern from our own review of the video whether a gesture occurred. Whether it occurred makes no difference to our analysis in this case.

the door, Guolee steps out and physically attacks E.F. After Guolee's initial attack, E.F. punches Guolee and the two continue to fight. E.F. begins backing up and Guolee follows E.F. and continues to physically attack him. The two fall to the ground and Guolee appears to continue to stab E.F. At one point there is a pause in the fighting but then Guolee again resumes his physical attack of E.F. Guolee testified that during the pause in fighting, E.F. told Guolee that if Guolee let E.F. back up, E.F. would rape and kill him.

¶9 Guolee testified that he stabbed E.F. repeatedly in the head and neck area. Guolee testified that his intent was not to kill E.F. but to get E.F. to stop bothering him. He hoped that prison staff would intervene quickly to stop the attack and that this would result in Guolee and E.F. being housed in different prison units. Guolee further testified that he did not complain to prison staff about E.F.'s threats prior to the incident because he did not want to be labeled a "rat."

¶10 At the close of evidence, Guolee requested jury instructions on perfect and imperfect self-defense. After again viewing the video of the incident, the circuit court denied Guolee's request for a self-defense instruction. The court concluded there was no evidence that, at the time of the incident, Guolee reasonably or actually believed that E.F. had interfered with Guolee's person or that physical violence from E.F. was imminent. The court specifically instructed the jury that perfect or imperfect self-defense was not an issue in the case.

¶11 The jury found Guolee guilty of attempted first-degree intentional homicide.

**DISCUSSION**

¶12     Guolee argues that the circuit court erred in denying his request to instruct the jury on perfect and imperfect self-defense. "A circuit court has broad discretion in deciding whether to give a requested jury instruction." *State v. Stietz*, 2017 WI 58, ¶12, 375 Wis. 2d 572, 895 N.W.2d 796. "But circuit court discretion is far more limited in some circumstances—including determining whether the evidence presented supports instructing the jury on … self-defense …." *State v. Johnson*, 2021 WI 61, ¶16, 397 Wis. 2d 633, 961 N.W.2d 18. Whether there are sufficient facts to warrant an instruction on self-defense is a question of law we review independently, but with the benefit of the circuit court's analysis. *Stietz*, 375 Wis. 2d 572, ¶14.

### I. Legal Standards Governing Perfect and Imperfect Self-Defense

¶13     Perfect self-defense is a privilege recognized in WIS. STAT. § 939.48(1) as an absolute defense to first-degree homicide. *See also* WIS. STAT. § 939.45(2) (noting that that privilege may be claimed under § 939.48 and stating that when "an actor's conduct is privileged, although otherwise criminal, [it] is a defense to prosecution for any crime based on that conduct"). Section 939.48(1) provides that a person may intentionally use force against another to prevent or terminate "what the person reasonably believes to be an unlawful interference with his or her person," and may only use such force as the person "reasonably believes is necessary to prevent or terminate the interference." The person may not use force intended or likely to cause death or great bodily harm unless the person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself." Sec. 939.48(1). The pattern instruction sets forth the elements of perfect self-defense as follows:

> The law of self-defense allows the defendant to threaten or intentionally use force against another only if:
>
> - the defendant believed that there was an actual or imminent unlawful interference with the defendant's person; and
>
> - the defendant believed that the amount of force the defendant used or threatened to use was necessary to prevent or terminate the interference; and
>
> - the defendant's beliefs were reasonable.

WIS. JI—CRIMINAL 800 (2023) (footnote omitted); *see also* *Stietz*, 375 Wis. 2d 572, ¶11. There is a subjective component to the privilege—"the defendant must have actually believed he or she was acting to prevent or terminate an unlawful interference"—and an objective component—"the belief must be reasonable." *State v. Giminski*, 2001 WI App 211, ¶13, 247 Wis 2d 750, 634 N.W.2d 604. Thus, for perfect self-defense, a defendant's beliefs must be actual and reasonable.

¶14 Before the privilege of self-defense may be considered by the factfinder, the defendant must raise the privilege as an affirmative defense. *State v. Head*, 2002 WI 99, ¶106, 255 Wis. 2d 194, 648 N.W.2d 413. "Once the defendant successfully raises [self-defense as] an affirmative defense, the state is required to disprove the defense beyond a reasonable doubt." *Id.* To obtain a self-defense instruction, the defendant must present "some evidence" that the defendant acted in self-defense. *Stietz*, 375 Wis. 2d 572, ¶16. This is a "low bar" and may be satisfied by evidence that is "'weak, insufficient, inconsistent, or of doubtful credibility.'" *Johnson*, 397 Wis. 2d 633, ¶17 (quoting *Stietz*, 375 Wis. 2d 572, ¶¶16-17). The circuit court may deny the requested instruction when "no reasonable basis exists for the defendant's belief that another person was unlawfully interfering with [the defendant's] person and that the defendant used or threatened the use of such force as [the defendant] reasonably believed necessary

7

to prevent or terminate the interference." *Stietz*, 375 Wis. 2d 572, ¶15. In making this determination, "circuit courts must not weigh the evidence; rather, the evidence must be viewed in the light most favorable to the defendant." *Johnson*, 397 Wis. 2d 633, ¶17.

¶15    Imperfect self-defense (unnecessary defensive force) mitigates the crime of first-degree intentional homicide to second-degree intentional homicide. *See* WIS. STAT. § 940.01(2)(b); *Head*, 255 Wis. 2d 194, ¶69. Unlike perfect self-defense under WIS. STAT. § 939.48(1), which "requires *reasonable* beliefs for perfect self-defense in every case," imperfect self-defense under § 940.01(2)(b) "does not require reasonable beliefs"; rather, "[i]t requires only *actual* beliefs even if they are unreasonable." *Head*, 255 Wis. 1d 194, ¶87; *see also* § 940.01(2)(b) (imperfect self-defense applies when "[d]eath was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable").

¶16    When a defendant seeks a jury instruction on imperfect self-defense, the defendant "is *not* required to satisfy an objective threshold showing that [the defendant] was acting under a reasonable belief that [the defendant] was in imminent danger of death or great bodily harm or that the force [the defendant] used was necessary to defend [him or] herself." *Head*, 255 Wis. 2d 194, ¶5. "Rather the defendant must show some evidence that [the defendant] *actually* believed that [he or] she was in imminent danger of death or great bodily harm and *actually* believed that the force [the defendant] used was necessary to defend [him or] herself." *Id.*

**II. Analysis**

¶17    As set forth above, both perfect and imperfect self-defense require that the defendant actually believe there was an actual or imminent unlawful interference with the defendant's person, but perfect self-defense also requires this belief to be reasonable.  Viewing the evidence in the light most favorable to Guolee, we conclude that the circuit court properly declined to give an instruction on either perfect or imperfect self-defense because there was no evidence that, at the time he attacked E.F., Guolee believed there was an actual or imminent unlawful interference with his person by E.F.  In light of this conclusion, we need not address the "reasonableness" of any such belief under the perfect self-defense standard.

> *A. No evidence that Guolee believed there was an actual unlawful interference by E.F.*

¶18    Although scarcely mentioned in his brief-in-chief, in his reply brief, Guolee relies heavily on the premise that a self-defense instruction was warranted because Guolee testified that E.F. threw the first punch.[3]  This appears to be an argument that there was some evidence that, at the time Guolee physically attacked E.F., Guolee believed there was an actual unlawful interference against Guolee's person.  We reject this argument.  As discussed in more detail below, after viewing video footage of the incident numerous times, the circuit court found that the footage clearly reflected that E.F. did not punch Guolee first, and that E.F. punched Guolee only after Guolee physically attacked him.  As we explain below,

---

[3] In Guolee's brief-in-chief, the statement of the facts and the arguments on self-defense do not refer to Guolee's testimony suggesting that E.F. punched Guolee first.  The only mention in Guolee's brief-in-chief that E.F. attacked first is in the "Issue Presented."

Guolee does not challenge this finding and our independent review of the video supports the court's finding. *See* **State v. Rejholec**, 2021 WI App 45, ¶17, 398 Wis. 2d 729, 963 N.W.2d 121 (when relevant events are in a video recording that is part of the record, "we are in the same position as the circuit court to determine what occurred").

¶19    The reference to E.F. throwing the first punch arose only once during the testimony at trial, namely, during Guolee's response to a question from the prosecutor during cross-examination.  The prosecutor asked Guolee, "Did [E.F.] ever hit you?" and Guolee responded, "Yes, when I first came out the door. That's when you see -- after we first started to get into it and I fall, that's -- yeah, he punched me."

¶20    This testimony indicates that E.F. did not punch Guolee until after they "started to get into it" and, therefore, does not support that Guolee actually believed E.F. threw the first punch before the fight started.  Nevertheless, this testimony could be deemed ambiguous as to when, according to Guolee, E.F. punched Guolee in relation to Guolee physically attacking E.F.  The circuit court relied on the video footage of the incident to resolve the ambiguity.  When the issue of self-defense instructions first arose, the court stated: "It may be … that before I rule on the self-defense instruction, I will want to see the video that you showed again yesterday.  To focus in on that moment that Mr. Guolee described yesterday where he says that [E.F.] hit him.…  I may want to see that just so I am satisfied I'm seeing what I need to see correctly."  After the close of evidence and before the final jury instructions, the court informed the parties, "[J]ust to complete my factual understanding, I would like to see that snippet I was talking about from your video.  The moments surrounding the beginning of the physical confrontation."

¶21    After rewatching a clip of the video, the circuit court instructed the prosecutor to "run through that same bit" four times. The court then stated that it had listened again that morning to Guolee's testimony to "ma[k]e sure [the court] understood all of what he said." The court then went through the facts pertinent to consideration of the self-defense issue. As to any suggestion by Guolee that E.F. punched Guolee first, the court found that the video showed the opposite. The court stated:

> Mr. Guolee testified initially that the motivation for the attack was that he was "done listening to him." Later he testified that his intent was to have him stop bothering him. That his intent was to create a situation where because of the controversy[,] the institution would separate [E.F.] and Mr. Guolee and thereby ins[u]late Mr. Guolee from [E.F.]
>
> On cross[-]examination, Mr. Guolee testified that [E.F.] hit him. And testified that it was on the video. That [E.F.] hit him when he first came out the door. Mr. Guolee testified that [E.F.] punched him after we got into it, and you see me fall. And you do see that in the video. The video documents more precisely Mr. Guolee's testimony insofar as the hit occurred after the altercation had begun, *not a first strike by [E.F.]*

(Emphasis added.) The court further stated, "[E.F.] was engaged in no conduct at that moment [of Guolee's attack] with respect to Mr. Guolee other than walking by."

¶22    Guolee does not argue that the video could be construed as showing that E.F. threw the first punch, nor does he challenge the circuit court's finding to the contrary. Rather, Guolee appears to argue that his single ambiguous statement on this point during his trial testimony constituted "some evidence" so as to warrant a self-defense instruction, even though the video explicitly shows that E.F. punched Guolee only after Guolee first attacked E.F. Guolee presents no authority

or developed argument in support of this premise. *See Clean Wis., Inc. v. PSC*, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."); *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered."). Moreover, Guolee's position is easily rejected: because the video establishes as undisputed that E.F. did not punch Guolee before Guolee physically attacked E.F., Guolee's testimony suggesting otherwise does not constitute some evidence to support a perfect or imperfect self-defense instruction.

¶23 In sum, we reject any argument that is premised on the assertion that E.F. threw the first punch.

### B. No evidence that Guolee believed there was a threat of "imminent" unlawful interference

¶24 As stated, the circuit court declined to instruct on both perfect and imperfect self-defense because there was no evidence that, at the time Guolee attacked E.F., Guolee actually believed that E.F. posed an "imminent" threat.[4] Guolee argues that this was error. We conclude that the record, including Guolee's own testimony, supports the court's decision.

¶25 In describing his thoughts immediately before the incident, Guolee testified: "And I think he seen me through the crack. And that's when he made something like -- I really didn't even listen to what he said. He threatened me again, and that was -- I just was done listening to it." The only specific statements that Guolee testified E.F. made at that time were that E.F. called Guolee a "honky"

---

[4] The circuit court also concluded that any such belief was not reasonable but, as stated, we need not address that issue.

and "trailer trash." When asked why he was done listening to him and what was going through his mind, Guolee testified, "Well, I mean, he had already said earlier in the week that he was going to kill me. And then when he came out, he was telling one of the other guys there that … if I was there at the end of rec, that'd be the last time I was there." When asked what Guolee thought would happen, he testified that there "was no telling" and that WSPF housed violent criminals and experienced institutional violence. He then testified, "I had heard that [E.F.] had been in some stuff with some other people before. And I just -- I wasn't going to let him do it to me. And it might not sound right. So, I just went out there first."

¶26 Although this testimony reflects Guolee's general concern that E.F. might do something to him at some point, there is no evidence that, at the time he physically attacked E.F., Guolee actually believed physical harm from E.F. was imminent. The video shows Guolee advancing quickly from the door into the outside recreation area and physically attacking E.F. as E.F. is walking by the door. As to E.F.'s alleged prior threats, when Guolee was asked why he did not simply tell staff about them prior to the incident, Guolee testified that he did not want to be labeled a "rat," suggesting that, in physically attacking E.F., Guolee was attempting to take matters into his own hands to stop E.F.'s alleged threats.

¶27 Moreover, Guolee was specifically asked by defense counsel what his intent was when he came out of the door and attacked E.F., and Guolee did not respond that it was to prevent imminent physical harm from E.F.:

> Q: And so, just to be clear, when you came out of that door, your intent was to tell him to stop bothering you?

> A: Yeah, to have him stop bothering me. And to -- if you cause an incident, and then the [correctional officers] know there's an incident, you get separated. You go to the

hole,… whatever they do. It's a way to accomplish the same thing as going up there and telling them you have a problem. You accomplish the same goal, but you just don't get labeled a rat or nothing like that, I guess.

This was consistent with Guolee's prior answer when asked about his intent while exiting the door and attacking E.F.:

Well -- okay, my first -- my first thinking is, there's a staff member I just seen; right? So, no matter what happens, if it's a fight or I use the shank or whatever, it's not going to last for more than a few seconds. The staff member's right there, they're going to break it up, it's over. None of the incidents really last too long, because staff are always right there. I mean, you seen how fast they got there that time. It don't take them long at all to break something up.

¶28 Further, during cross-examination, Guolee was asked, "[A]fter you come out that first door, I mean he's the one backing up and you're the one advancing on him; right?" and Guolee testified, "Yes, sir." Guolee further acknowledged during cross-examination:

Was there a battery? Yes. Am I responsible for it? Yes. Did I try to kill him? No. Am I in a bad situation that I made worse on myself? Yes. Could I have done something else? Yes. In hindsight do I wish I had, I don't know, not had a knife or something? Yes.

But, in my living environment, I'm in there with killers, rapists, child molesters, I'm in there with all these people. And you never know what's going to happen to you. So, it's better to be safe than sorry.

Guolee's testimony, along with the video of the incident, shows that, at the time he attacked E.F., Guolee did not actually believe there was an imminent threat. As the circuit court aptly summarized the evidence on this point: "[T]here are no facts from which a reasonable inference can be drawn that Mr. Guolee could have actually believed there was anything imminent. The record is that he was tired of listening to him. That's different." The record supports the court's factual

14

findings and its conclusion that Guolee was not entitled to an instruction on self-defense because there was no evidence that, at the time he attempted to kill E.F., Guolee actually believed that a physical attack from E.F. was imminent.

## CONCLUSION

¶29     For all of the reasons stated, we affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published.   *See* WIS. STAT. RULE 809.23(1)(b)5.