COURT OF APPEALS
DECISION
DATED AND FILED

September 18, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP72-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF2240

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KENYAIRRA I. GADSON,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dane County: CHRIS TAYLOR, Judge. *Affirmed*.

Before Graham, P.J., Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  Kenyairra Gadson appeals a judgment convicting her of first-degree reckless homicide and possession of a firearm by an adjudicated felon.  At trial, Gadson's defense against the homicide charge was that she and her cousin were attacked by the victim and his associate, and that she shot the victim in her own and her cousin's defense.  On appeal, Gadson argues that the circuit court erred by preventing her from introducing evidence of certain incidents of prior violent conduct by the victim's associate at trial; by allowing the admission into evidence of Facebook messages that Gadson sent about her gun in the days leading up to the shooting; and by not instructing the jury on the privilege of the defense of others.  We reject Gadson's arguments and affirm the judgment of conviction.

## BACKGROUND

¶2      The events that led to Gadson's conviction occurred in Madison, Wisconsin during the early morning hours of October 28, 2018.  Gadson and others including her cousin, Courtney Miller, arrived at a downtown parking ramp shortly before 2:00 a.m. with the intent to go bar hopping.  After exiting the ramp, they passed another group that included Donivan Lemons and the homicide victim, Steven Villegas.

¶3      There was a long-running feud between Gadson's family and Lemons' family.  Upon seeing Lemons, Gadson and Miller circled back to their vehicle in the parking ramp, and then exited the ramp and passed Lemons' group again.  They repeated this route two more times.  On the final time that Gadson and Miller passed Lemons' group, Lemons and Villegas followed them into the ramp.  An altercation ensued, during which Gadson shot and killed Villegas.

¶4    Gadson was less than fully forthcoming in an initial interview with police, but she eventually acknowledged that she fired the shot that killed Villegas. However, she claimed that she did so to protect Miller and herself. Specifically, Gadson stated that she fired a gun in order to scare Lemons and Villegas off, and that "somebody had to stop … [them] hitting my cousin [Miller] and … stop [them] trying to kill me."

¶5    The State filed a complaint charging Gadson with first-degree intentional homicide and possession of a firearm by a person who had been adjudicated a felon. The first-degree intentional homicide charge was later amended to first-degree reckless homicide. Prior to the trial, the circuit court addressed two sets of motions that are relevant to this appeal.[1]

¶6    First, Gadson moved to admit evidence related to her ongoing feud with Lemons, and specifically, evidence of Lemons' prior violent acts towards Gadson and her family members. As we discuss in more detail below, when the issue of self-defense is raised at trial and there is a factual basis to support it, the defendant may move to present so-called *McMorris* evidence in support of the defense. Here, Gadson sought to admit twelve prior acts committed by Lemons and his associates between 2014 and 2018. The circuit court determined that six of the twelve acts were admissible as *McMorris* evidence, but that the remaining six were not admissible because their probative value was substantially outweighed by other considerations.[2] Gadson filed a motion asking the court to

---

[1] The Honorable Jill M. Karofsky presided over the pretrial proceedings and decided the pretrial motions at issue here. The Honorable Chris Taylor presided over the trial.

[2] In its respondent's brief, the State contends that the circuit court miscounted and that it actually allowed Gadson to admit evidence of seven of the twelve incidents, but it is the State that has miscounted.

reconsider its ruling on five of the six incidents that it excluded, and the court denied the motion.

¶7 Second, the State moved to admit "other acts" evidence, including various incidents of Gadson's prior threatening and violent conduct towards Lemons and his associates, as well as certain Facebook messages Gadson sent about a gun she owned. The circuit court determined that some but not all of Gadson's prior conduct would be admitted. With respect to the Facebook messages, which showed that Gadson was persistently attempting to retrieve her gun from a friend in the days leading up to the shooting, the court said that "they're going to be hearsay" and "I don't know how you're going to get them in." However, the court indicated, the State would be allowed to introduce other evidence about Gadson's attempts to retrieve her gun.

¶8 The case proceeded to an eleven-day jury trial in January 2022. The principal dispute at trial was over Gadson's defense, and whether she was entitled to use deadly force in self-defense or in Miller's defense.

¶9 The State's theory was that Gadson was antagonistic towards Lemons because he had purportedly played a role in sending her brother to prison. It theorized that the shooting occurred not because Gadson was "in fear for her safety or [the safety of] others," but rather as part of "a trap" that Gadson had "laid" for Lemons.

¶10 To support this theory, the State presented evidence that Gadson had downloaded a picture of Lemons just hours before the shooting, and it played surveillance footage that depicted the interactions between Gadson's group and Lemons' group shortly before the altercation occurred. According to the State, this footage showed Gadson baiting Lemons and Villegas to follow her into the

4

parking ramp, where she had a gun stashed in the vehicle. The State also presented evidence that Gadson had been trying to retrieve her gun from a friend, but consistent with the pretrial ruling, the State did not initially attempt to introduce the Facebook messages on that topic. It instead presented the testimony of a detective, who testified that Gadson had made "multiple," "frantic" efforts over "many days" to retrieve her gun.

¶11 The State also presented testimony from a number of witnesses to support its argument that Gadson's use of deadly force was unreasonable under the circumstances. Lemons and Miller both testified, and neither stated that anyone attacked Gadson, nor did they state that Miller was in grave danger. Lemons testified that he initiated the altercation by punching Miller, but he did not attack Gadson. For his part, Miller testified that Lemons hit him only once, and that he successfully held off Lemons and Villegas from attacking him further. An independent eyewitness who was in the parking ramp when the shooting occurred testified that he observed Gadson grab a firearm from her waistband, move towards Villegas, and shoot him.

¶12 Gadson was the first witness for the defense, and throughout her testimony, she consistently stated that she shot Villegas to protect herself. Specifically, Gadson testified that she was "deathly afraid" of Lemons, that she was "scared" when she first saw him that night, and that her "heart dropped" when he followed her and Miller into the parking ramp. Gadson testified that the altercation started when Lemons and Villegas attacked Miller, and then Villegas started to come towards her in a tackling motion. She testified that she grabbed the gun out of the vehicle and shot Villegas so "he couldn't get to me."

¶13   Gadson testified that she did not have a plan to trap Lemons. When asked on direct examination why she brought a gun with her that night, Gadson testified that it was a "new gun" that she wanted to show to Miller. She further testified that the reason she had a new gun was because a friend had borrowed her gun to use at a shooting range, and he "brought [back] a different gun" when "it was time for him to return [it]."

¶14   The State then argued that this testimony "open[ed] the door" for Gadson's Facebook messages. Specifically, the State argued, Gadson's testimony suggested "that she was totally okay" with her friend returning some "random gun" when "in reality," the messages showed that she was "screaming at this person to get her gun back over and over." The circuit court concluded that Gadson had testified "enough about this gun and why she got it back" to "open[] the door to questions," and further reasoned that the messages "also … probably go to credibility … and bias." The State introduced the messages, which we describe in greater detail below, on cross-examination.

¶15   The defense also presented testimony from multiple witnesses about the ongoing feud between Gadson and Lemons, and more specifically, about certain violent and threatening acts by Lemons and his associates. According to these witnesses, the feud began in 2014, when Lemons identified Gadson's brother as the assailant in a shooting incident. Gadson posted about these events on social media and called Lemons "a snitch" for implicating her brother. This led to Lemons having animosity towards Gadson, and a series of violent and threatening acts followed. Specifically, witnesses testified about multiple occasions between 2014 and 2018 when Lemons and his associates threatened, fought, drew weapons on, or fired shots at Gadson and her family members and friends. Gadson's counsel argued that these acts were relevant to her state of mind at the time of the

shooting, and that they supported the defense theory that Gadson reasonably feared for her own life and Miller's life when she shot Villegas.

¶16    Both sides also presented testimony from use of force experts.  The defense expert opined that it was appropriate for Gadson to use deadly force under the circumstances, noting that she was "under attack" and "trapped," and that "[t]here was a huge disparity of force" between Gadson and her attackers.  By contrast, the State's expert opined that there were no articulable facts that made Gadson's use of deadly force reasonable, noting that there was no evidence of any weapon being used or threatened against Gadson during the altercation.

¶17    After the close of evidence, the parties agreed that the circuit court should instruct the jury about the privilege of self-defense.  Gadson asked the court to also instruct the jury about the privilege of defense of others.  As we discuss in greater detail below, the court declined to give that instruction, reasoning that there was not "sufficient evidence" to support the theory that Gadson was defending Miller when she shot Villegas.

¶18    The jury found Gadson guilty on both counts.  Gadson appeals.

## DISCUSSION

¶19    Gadson argues that the circuit court erred by not allowing her to present *McMorris* evidence about several of Lemons' prior violent acts at trial; by determining that the State could introduce Gadson's Facebook messages about her gun; and by declining to give the defense-of-others jury instruction.  We address Gadson's arguments in that order.

7

## I. *McMorris* Evidence

¶20    "It is well established that a defendant seeking to support a self-defense claim may attempt to 'prove prior specific instances of violence within the defendant's knowledge at the time of the incident.'" *State v. McClaren*, 2009 WI 69, ¶21, 318 Wis. 2d 739, 767 N.W.2d 550 (citations omitted, citation modified). This type of evidence, commonly referred to as *McMorris* evidence, is used to "establish what the defendant believed to be the turbulent and violent character of the victim." *McMorris v. State*, 58 Wis. 2d 144, 152, 205 N.W.2d 559 (1973). Such evidence can be admitted because it "bears on the reasonableness of the defendant's apprehension of danger at the time of the incident," but cannot be used "to support an inference about the victim's actual conduct during the incident." *State v. Head*, 2002 WI 99, ¶128, 255 Wis. 2d 194, 648 N.W.2d 413 (citation omitted, citation modified).

¶21    Admissibility of *McMorris* evidence is "not automatic," *id.*, and is "within the circuit court's discretion," *McClaren*, 318 Wis. 2d 739, ¶21. "As with any 'other acts evidence,'" *McMorris* evidence is subject to the balancing test outlined in WIS. STAT. § 904.03 (2023-24),[3] which requires a court to weigh the probative value of the evidence against "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here, Gadson bears the burden to demonstrate that the circuit court erroneously exercised its discretion in excluding evidence. *Winters v. Winters*, 2005 WI App 94, ¶18, 281 Wis. 2d 798, 699 N.W.2d 229.

---

[3] All references to the Wisconsin Statutes are to the 2023-24 version.

¶22 As mentioned, the circuit court determined that Gadson would be allowed to present evidence about certain prior acts by Lemons and his associates at trial, but evidence about other incidents would be excluded. More specifically, Gadson would be allowed to—and did—present evidence about the following incidents: that Lemons chased a vehicle occupied by Gadson's brother and sister and fired shots at the vehicle in 2014; that Lemons shot at Gadson's brother and sister in a grocery store parking lot in early 2015, which led to a vehicle chase; that Lemons and his associates drew their guns on Gadson outside a house party in 2015, and that Lemons shot his gun into the air and fought with Gadson's cousin; that Lemons made Gadson leave a different party she was attending in 2015 and his associate fired shots in the direction of Gadson's feet; that Lemons approached Gadson at a bar in 2018 and said he would fight anyone who was with her, and then did fight with Gadson's sister's boyfriend; and that Lemons' sisters attacked Gadson at a downtown bar in the fall of 2018. By contrast, Gadson would not be allowed to present evidence about the following incidents, all of which occurred in late 2014 and early 2015: that Lemons and his associates attacked Gadson's brother with a brick; that Lemons held Gadson's brother at gunpoint; that Lemons threatened Gadson's brother and his friend at a basketball game; that Lemons attempted to attack Miller at a gas station, when Gadson was present; that Lemons threatened Miller at a basketball game, when Gadson was present; and that Lemons attacked Miller and another friend of Gadson and Miller.

¶23 When excluding these latter incidents, the circuit court determined that their probative value was minimal for a combination of the following reasons: because the incidents were "too remote" in time; because some of the incidents did not involve firearms; and because Gadson was not present for some of the incidents. The court also applied the balancing test in WIS. STAT. § 904.03 and

reasoned that the probative value of these incidents was substantially outweighed by the danger of "confusing the jury," needlessly presenting "cumulative evidence," and "undue delay."

¶24     We conclude that this was a reasonable application of the law to the facts. *See **Martindale v. Ripp***, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698 (we will "uphold a decision to … exclude evidence if the circuit court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion").  The purpose of ***McMorris*** evidence is to help the jury evaluate the defendant's "state of mind at the time of" the incident, ***McMorris***, 58 Wis. 2d at 152, and to assist the jury in determining whether the "defendant's apprehension of danger" was reasonable, ***Head***, 255 Wis. 2d 194, ¶128.  Here, the circuit court allowed Gadson to present what it considered to be the most probative evidence regarding Gadson's state of mind and her apprehension of danger at the time of the shooting, and it reasonably excluded the incidents that it determined were less probative on those points.  The court was also reasonably concerned about the potential for confusion of the issues if the trial focused too much on past acts, rather than on what took place on the night Gadson shot Villegas, and also that evidence of the excluded incidents would be cumulative and cause undue delay.

¶25     Gadson argues that this reasoning is erroneous.  She contends that all of the incidents were relevant to her state of mind and what she reasonably believed when she shot Villegas because she knew about the prior incidents on the day in question, when she and Miller were attacked.  Yet, as stated, the admissibility of ***McMorris*** evidence is "not automatic," *see **McClaren***, 318 Wis. 2d 739, ¶21, and a court is required to balance its probative value against the considerations outlined in WIS. STAT. § 904.03.  Thus, even though it is true that

10

these incidents might have had some relevance to the disputed issues, the circuit court was not required to admit them based on its reasoned application of § 904.03. In other words, although the court could reasonably have determined that the balance tipped in the other direction, that does not mean that its decision to exclude these incidents was erroneous.

¶26 Gadson makes another claim with respect to the circuit court's exclusion of the *McMorris* evidence, which we now address. She argues that the exclusion of the aforementioned incidents violated her constitutional right to present a defense. For reasons we now explain, we disagree.

¶27 The federal and state constitutions guarantee criminal defendants the right to present evidence in their defense. *See State v. Sarfraz*, 2014 WI 78, ¶37, 356 Wis. 2d 460, 851 N.W.2d 235 (citing U.S. CONST. amend. VI; WIS. CONST. art. I, § 7). Yet, "the right to admit favorable testimony" is "not absolute." *See State v. St. George*, 2002 WI 50, ¶¶14-15, 252 Wis. 2d 499, 643 N.W.2d 777 (citation omitted). In some circumstances, evidence "may be so relevant and probative that the defendant's right to present it is constitutionally protected." *Id.*, ¶15. However, the constitutional right to present favorable evidence extends "only [to] relevant evidence that is not substantially outweighed by its prejudicial effects." *State v. Stutesman*, 221 Wis. 2d 178, 182, 585 N.W.2d 181 (Ct. App. 1998). We review de novo whether a defendant has been denied the constitutional right to present a defense. *State v. Kraemer*, 2006 WI App 133, ¶22, 294 Wis. 2d 780, 720 N.W.2d 459.

¶28 Here, Gadson argues that the excluded incidents were "critical" to her defense because without them, the jury did not have an understanding about how the feud between her family and Lemons began. That is, the jury was

unaware that Lemons initiated the feud in 2014, when he attacked Gadson's brother with a brick. Without this evidence, Gadson argues, the jury was "left to believe" that the feud started when Gadson's brother shot Lemons' associate. Gadson further posits that, without the excluded evidence, the jury would have been left with the wrong impression that Gadson and her family "were the aggressors" and "not the ones being attacked."

¶29 We disagree that evidence about the genesis of the feud between the families was critical to the defense. To prevail in her defense, Gadson needed to persuade the jury that she reasonably believed that Villegas posed an imminent threat of death or great bodily harm *at the time she shot him.* *See* WIS. STAT. § 939.48(1). Gadson fails to explain why the purported fact that Lemons instigated the long-simmering feud more than four years prior is "so probative" of and "relevant" to Gadson's belief about the threat she faced that night such that she had a constitutional right to present it. *See St. George*, 252 Wis. 2d 499, ¶15.

¶30 We also disagree that the jury would have been given the impression that Gadson and her family members were always the aggressors in the conflict. As shown above, the jury was presented with testimony about a variety of incidents in which Lemons and his associates were aggressors and attacked Gadson and members of her family—specifically, that Lemons and his associates drew their guns on Gadson and fired shots in the air and in her direction; that Lemons chased and shot at vehicles occupied by Gadson's siblings on more than one occasion; and that Lemons told Gadson he would fight anyone who was with her. There was also testimony that, the week before the shooting, Lemons told Gadson's friend to tell Gadson that Lemons had "something for her next time he [saw] her," and that Lemons threatened to "whoop [Gadson's] ass." To be sure, the excluded evidence would have provided additional support for the idea that

Lemons had exhibited violent and threatening behavior, but the circuit court appropriately determined that the excluded evidence was cumulative on this point. *See State v. Heft*, 178 Wis. 2d 823, 830-32, 505 N.W.2d 437 (Ct. App. 1993) (the defendant was not "deprived of a fair opportunity to present a defense" because she was able to present other evidence on the critical issues).

¶31 Accordingly, for all these reasons, we reject Gadson's argument that the circuit court improperly excluded **McMorris** evidence, including her argument that its exclusion violated her constitutional right to present a defense.

## II. Gun Communications

¶32 Gadson argues that the circuit court erred when at trial, it allowed the State to introduce Facebook messages that Gadson sent in the days before the shooting, in which Gadson demanded that her friend return a gun that belonged to her. More specifically, the evidence showed that on October 26 and 27, 2018, less than two days before the shooting, Gadson sent her friend a series of messages that included the following: "Where you at with my shit?"; "And I'm done [fucking with you] I don't do games nor have time for them"; "Bring me my shit & my money"; "[Motherfucker] told me it took a day to get that back I needs my shit [where you at] you finna make me show u something." On cross-examination, Gadson appeared to agree that the references to her "shit" were to her gun, and that she was upset when her friend did not return the gun as promised.

¶33 As mentioned, during the pretrial proceedings, the circuit court determined that the Facebook messages were hearsay. However, later at trial, the court determined that the messages could be admitted because Gadson had "opened the door" to them during her trial testimony. *See State v. Dunlap*, 2002 WI 19, ¶¶14-15, 250 Wis. 2d 466, 640 N.W.2d 112 (the "curative admissibility

doctrine, commonly referred to as 'opening the door'" allows a party "to introduce otherwise inadmissible evidence" if the other party "accidentally or purposefully" takes advantage of that evidence and if it is necessary to "prevent unfair prejudice").

¶34 On appeal, Gadson contends that the circuit court erred in admitting the messages on the basis that she "opened the door." We need not resolve whether the court's determination in this respect was correct because we conclude that Gadson's messages were admissible on other grounds. *Glendenning's Limestone & Ready-Mix Co., Inc. v. Reimer*, 2006 WI App 161, ¶14, 295 Wis. 2d 556, 721 N.W.2d 704 (providing that the court of appeals "may affirm the circuit court on an alternative ground"). Specifically, we conclude that Gadson's messages were admissible as an "[a]dmission by a party opponent" under WIS. STAT. § 908.01(4)(b)1, which allows for the admission of out-of-court statements from a "party opponent" if the statements are the party's "own statement[s]" and are "offered against" the party.

¶35 Gadson challenges the admissibility of the messages on two other grounds, but neither is persuasive. She first argues that the messages should not have been admitted because they were not relevant. *See* WIS. STAT. § 904.02 ("Evidence which is not relevant is not admissible."). Specifically, Gadson argues that her messages about retrieving her gun were not relevant because she admitted that she had a gun and used it to kill Villegas. Accordingly, she contends, "[w]hether or not she was swearing at the person who would not return her gun … does not make any difference to her self-defense or defense of others theory in this case."

14

¶36     It is true that Gadson's messages about the gun were not probative of Gadson's defense. That is, the messages do not help show that Gadson reasonably believed she needed to use deadly force against Villegas at the moment she shot him. WIS. STAT. § 939.48(1). However, the State had the burden to prove that Gadson did not shoot Villegas in self-defense, *see **Head***, 255 Wis. 2d 194, ¶103, and its theory, at least in part, was that Gadson set a "trap" for Lemons and "was ready and in fact eager" to use a weapon "if the opportunity arose." The fact that Gadson was persistently attempting to retrieve her gun in the days leading up to the shooting made the State's theory at least somewhat "more probable," WIS. STAT. § 904.01, and therefore, the messages were relevant.

¶37     Gadson next argues that the messages should have been excluded because "any possible relevance to these communications was outweighed by the substantial prejudice" to Gadson. However, as the State points out, the pertinent inquiry is not whether the evidence might be substantially prejudicial to a party, but whether the evidence is *unfairly* prejudicial. *See* WIS. STAT. § 904.03; ***State v. Mordica***, 168 Wis. 2d 593, 605, 484 N.W.2d 352 (Ct. App. 1992) ("'Unfair prejudice' does not mean damage to a party's cause, since such damage will always result from the introduction of evidence contrary to the party's contentions" (citation omitted)); ***State v. Sullivan***, 216 Wis. 2d 768, 790, 576 N.W.2d 30 (1998) (evidence is unfairly prejudicial when it has "a tendency to influence the outcome by improper means," "appeals to the jury's sympathies," "arouses [a] sense of horror," "provokes [the] instinct to punish," or "otherwise causes a jury to base its decision on something other than the established propositions in the case"). We have explained why the messages were at least somewhat probative of the State's theory of the case, and Gadson does not develop any argument to explain why any prejudice to her was unfair. Accordingly, we are

not persuaded that the circuit court was required to exclude these messages pursuant to § 904.03.

### III. Defense-of-Others Instruction

¶38 Gadson argues that the circuit court erred when it declined to give a jury instruction on the defense-of-others privilege. Whether the evidence establishes a sufficient basis for a particular jury instruction is a question of law that we review de novo. *See State v. Dundon*, 226 Wis. 2d 654, 662, 594 N.W.2d 780 (1999). In making this determination, we view the evidence in the light most favorable to the defendant and the giving of the instruction. *State v. Stietz*, 2017 WI 58, ¶13, 375 Wis. 2d 572, 895 N.W.2d 796.

¶39 The privilege to use force to defend others is found in WIS. STAT. § 939.48(4). That statute provides that a person is privileged to use force in defense of a third person if "the person reasonably believes that the facts are such that the 3rd person would be privileged to act in self-defense and that the person's intervention is necessary for the protection of the 3rd person." § 939.48(4). A defendant claiming the defense-of-others privilege must satisfy two components: "(1) subjective—the defendant must have actually believed he or she was acting to prevent or terminate an unlawful interference [with the third person]; and (2) objective—the belief must be reasonable." *State v. Giminski*, 2001 WI App 211, ¶13, 247 Wis. 2d 750, 634 N.W.2d 604.[4]

---

[4] Under the standard jury instruction for defense of others, a defendant is privileged to act in defense of others only if the defendant: "believed that there was an actual or imminent unlawful interference with" a specific person; "believed that [the person under attack] was entitled to use or threaten to use force in self-defense"; "believed that the amount of force used or threatened by the defendant was necessary for the protection of [the person]"; and "the defendant's beliefs were reasonable." WIS JI—CRIMINAL 830 (2005).

¶40 The burden of production required to receive a particular jury instruction is low, and here, Gadson must specifically show that there is "some evidence" in the record that supports the subjective and objective components of the defense-of-others privilege. *See id.*; *see also* **State v. Schulz**, 102 Wis. 2d 423, 430, 307 N.W.2d 151 (1981). Although evidence may satisfy the "some evidence" standard even if it is "weak, insufficient, inconsistent, or of doubtful credibility or slight," a circuit court may deny a requested instruction for a defense if "no reasonable basis" exists in the record for the defense. **Stietz**, 375 Wis. 2d 572, ¶¶15-17 (citations omitted).

¶41 Here, the circuit court determined that there was not "sufficient evidence" in the record to warrant the defense-of-others instruction. The court explained that it was "looking for evidence" that could support giving the instruction, but that there was "almost nothing that [the court] could find." The court specifically considered the testimony from Gadson and Miller and it concluded that, although it was undisputed that Miller had been punched, there was no testimony elicited that suggested that Miller was under threat of anything approaching great bodily harm or death. The court further stated that the "only reference" in the record that could support an instruction was a statement that Gadson made in her police interview, but that this reference was not sufficient on its own "to get this instruction."

¶42 We agree with the circuit court's analysis. As stated, to be entitled to a defense-of-others instruction, Gadson was required to produce some evidence to satisfy the subjective and objective components of the defense. *See* **Giminski**, 247 Wis. 2d 750, ¶13. That is, Gadson was required to produce some evidence that she "actually believed … she was acting to prevent or terminate an unlawful interference [with Miller]" and that that belief was "reasonable." **Id.** Even

viewing the evidence in the light most favorable to Gadson, there is no evidence that could satisfy either component here.

¶43 Regarding the subjective component, the record shows that Gadson was asked several times during trial why she shot Villegas, and each time she testified that it was to protect herself. Although Gadson testified that she saw Villegas hit Miller, she never testified that she thought Miller was under threat of imminent death or great bodily harm, nor did she testify that she shot Villegas to protect Miller.

¶44 Turning to the objective component, the record does not support that it was reasonable for Gadson to believe that Miller "faced imminent death or great bodily harm." *See* ***State v. Jones***, 147 Wis. 2d 806, 815, 434 N.W.2d 380 (1989). Miller testified that he was "only hit once" and then was able to "hold off" his attackers. And according to Gadson's own account, Villegas was not attacking, using force against, or threatening Miller at the time when she used the gun to purportedly defend Miller from Villegas. As Gadson described it, Villegas had moved away from Miller and started to come after her when she grabbed the gun from the glove compartment and shot it. Under these circumstances, we agree with the circuit court that there is not sufficient evidence to show that it would be reasonable to believe that Miller faced imminent death or great bodily harm.

¶45 Gadson disputes this conclusion. She first cites to our supreme court's decision in ***Jones***, 147 Wis. 2d at 815, which provides that "the key question" in a defense-of-others case is whether "the defendant reasonably believed that [the third person] faced imminent death or great bodily harm or whether … the threat of imminent death or great bodily harm to the [the third person] had passed by the time of the [use of deadly force]." Gadson argues that

18

here, the threat of imminent death or great bodily harm to Miller was "ongoing" because Lemons was still attempting to fight Miller and the attack on him "continued until the gunshot was fired."

¶46 We disagree with this argument for two reasons. First, we question Gadson's assertion that she could be privileged to shoot Villegas in order to protect Miller from an ongoing threat posed by Lemons. But even if the privilege could apply under these facts, there is nothing in the trial record that suggests that it was reasonable to believe that the threat Lemons posed to Miller was of imminent death or great bodily harm. Again, Miller testified that he was hit once, after which he was able to hold Lemons off so that he "couldn't hit me no more."

¶47 Gadson also contends that her police interview, which was played for the jury, constitutes "some evidence" in the record to support giving the defense-of-others instruction. In that interview, Gadson told the police that she "was hoping" that the bullet she shot would go to "the ground or something, like so they could start running because somebody had to stop … [them] hitting [Miller] and … stop [them] trying to kill me." We agree with the circuit court that this statement by itself is not sufficient to satisfy Gadson's burden of production to receive the defense-of-others instruction. Although it may provide some marginal support for the subjective component of the defense—that Gadson actually believed she was defending Miller when she fired the gun—the statement does not show that Gadson believed that she was protecting him from imminent death or great bodily harm, or that any such belief would have been objectively reasonable.

¶48 For all these reasons, we conclude that the circuit court did not err when it declined to give the defense-of-others instruction.

19

## CONCLUSION

¶49     For the reasons explained above, we reject Gadson's arguments and affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.